365 S.E.2d 82

James L. DAVIS

v.

KITT ENERGY CORP.

KITT ENERGY CORP.

v.

James L. DAVIS and West Virginia Coal Mine Health & Safety Board of Appeals.

No. 17668.

Supreme Court of Appeals of West Virginia.

Dec. 21, 1987.

Dissenting Opinion Jan. 28, 1988.

38

Webster J. Arceneaux, III, Charleston, Michael J. Aloi, Fairmont, for Davis.

Joseph M. Price, Charleston, for Kitt Energy.

Charles G. Brown, Atty. Gen., Steve Barcley, Asst. Atty. Gen., for Coal Mine Health & Safety Bd.

MILLER, Justice:

This case presents two questions regarding the application of W.Va.Code, 22A–1A–20,[1] the anti-discrimination section of our "Mine Safety Act." First, we must determine whether a demand by a safety committeeman to withdraw workers from a mine due to a safety hazard is an activity for which discrimination is prohibited. Second, we consider whether a prior arbitration decision which is adverse to the miner bars a statutory remedy for discrimination.

1. Formerly W.Va.Code, 22–1–21. After the date of the incident in this case (1982), the responsibility for enforcement of our Mine Safety Act was transferred from the Department of Mines to a newly created Department of Energy. This legislation recodified the mine safety statutes, but did not substantially alter the mine safety law. 1985 Acts of the Legislature Ch. 77. We have elected to refer to the new statutes in the text, and to footnote their 1982 counterparts.

## I.

James L. Davis, the plaintiff below, is employed by Kitt Energy Corporation as an underground coal miner at its No. 1 Mine in Philippi, West Virginia. Until his removal in 1982, he served as chairman of the Mine Health and Safety Committee, a local body provided for under the mine's collective bargaining agreement. *See* Art. III, § d of the National Bituminous Coal Wage Agreement of 1981. The committee is comprised of a number of experienced miners who are employed at the mine and appointed by the local union. It provides liaison between the miners and the employer on various matters of mine safety and health.

At 2:10 a.m. on September 1, 1982, a broken water main was discovered at the "C" and "D" track switch area of the mine. Repair work was immediately commenced. As a result of the break, water accumulated for a distance of 150 feet along "D" track, a designated escapeway.[2] Though the depth of water along the track is disputed by the parties, it exceeded twenty-four inches at maximum. A portable pump was installed by Kitt to remove the water from the track. The water condition was apparently not reported by the fire boss during the preshift inspection.[3] At 7:30 a.m., a longwall crew began to work inby the switch area on its scheduled shift.

When Mr. Davis arrived at the mine shortly after 7:30 a.m., he was orally advised of the water accumulation in "D" track by other workers. He immediately approached F.R. Jacobs, the mine superintendent, and demanded a withdrawal of workers from the area. Mr. Jacobs objected, and observed that "D" track was passable and did not pose an imminent danger. Mr. Davis disagreed. He then invoked the authority, conferred upon safety committeemen by the wage agreement, to demand an immediate withdrawal of mine personnel where an imminent danger is believed to exist.[4] Mr. Jacobs promptly complied with the demand.

Mine inspectors were advised by telephone of the water condition, and within an hour two federal inspectors arrived at the mine. These inspectors, together with Mr. Davis and three Kitt representatives, investigated the affected area of "D" track. A citation was issued for the presence of floodwater in an escapeway, a violation of 30 C.F.R. § 75.1704.[5] However, no imminent danger was cited by the inspectors.[6] State inspectors did not conduct a physical examination of the mine but, after a telephone conference, concurred in the findings made by the federal inspectors.

After the inspection was completed, Mr. Jacobs ordered the crew to return to work inby "D" track. Minutes later, Mr. Davis "dangered off" the area and again demanded a withdrawal of workers. Kitt complied and production remained idle until the water was removed at 1:30 p.m. Later in the

---

**2.** An escapeway is an underground passage which provides an emergency route of escape to the surface for mine personnel. W.Va.Code, 22A–2–60(b), requires an operator to designate and maintain two escapeways.

**3.** The fire boss is required to examine the mine prior to each shift for methane levels and for compliance with safety regulations. He is authorized to "danger off" hazardous areas and must record the results of his examinations in a fire boss book. W.Va.Code, 22A–2–20.

**4.** Art. III, § d of the wage agreement provides, in part:
"If the Committee believes conditions found [during inspection of the mine] endanger the lives and bodies of the Employees, it shall report its findings and recommendations to the Employer. In those special instances where the Committee believes that an imminent danger exists and the Committee recom-

mends that the Employer remove all Employees from the involved area, the Employer is required to follow the Committee's recommendation and remove the Employees from the involved area immediately."

**5.** 30 C.F.R. § 75.1704 provides, in part:
"Mine openings shall be adequately protected to prevent the entrance into the underground area of the mine of surface fires, fumes, smoke, and floodwater."

**6.** 30 U.S.C. § 817 authorizes an inspector to issue an order requiring the operator to immediately withdraw all mine personnel from a mine area in which an "imminent danger" exists. The withdrawal order remains operative until the inspector determines the danger has been abated. Like authority is given to state mine inspectors under W.Va.Code, 22A–1A–13, and existed in 1982 under W.Va.Code, 22–1–14.

day, Mr. Davis was advised by Kitt management that it had removed him from the safety committee pursuant to procedures outlined in the wage agreement. The stated reason for the removal was that his two withdrawal demands had been arbitrary and capricious.[7]

On September 7, 1982, Mr. Davis brought a grievance challenging his removal from the safety committee. The matter was unresolved through the grievance process and was submitted to arbitration. On November 22, 1982, after two days of hearings, the arbitrator upheld the removal. He concluded that there was no imminent danger presented by the flooded escapeway because it was passable and alternate routes of escape were available. He also determined that the withdrawal demand was arbitrary and capricious, as it was contrary to the findings of the mine inspectors and unsupported by objective evidence.

Two weeks after the arbitration decision was announced, Mr. Davis petitioned for review of his removal pursuant to W.Va. Code, 22A–1A–20. He claimed that the removal was in retaliation for "notif[ying] ... the operator ... of [an] alleged violation or danger" at the mine, an activity for which discrimination is prohibited. Evidentiary hearings were held before the Coal Mine Safety Board of Appeals in March, 1983. On November 15, 1983, a majority of the Board determined as follows: (1) that a good faith demand by a safety committeeman to withdraw miners due to imminent danger is a protected activity under W.Va. Code, 22A–1A–20; (2) that removal of a safety committeeman for a protected activity is discriminatory; and (3) that the affected escapeway was not passable and, thus, was in violation of W.Va.Code, 22A–2–60.[8] The Board ordered Kitt to reinstate Mr. Davis to his post and to restore all accrued benefits.

Kitt refused to comply with the order, and Mr. Davis thereupon brought suit in the Circuit Court of Barbour County. A preliminary injunction was issued by the court on March 15, 1984.[9] Kitt answered and counterclaimed to obtain enforcement of the prior arbitration decision and to enjoin enforcement of the Board's order. It also sought a declaration that Mr. Davis was precluded from pursuing a discrimination remedy under W.Va.Code, 22A–1A–20, by the removal provisions contained in the wage agreement.

On July 9, 1984, the circuit court consolidated the suit by Mr. Davis and a direct appeal of the Board's order. The Board was granted leave to intervene in the consolidated suit. Kitt moved for summary judgment and, in an opinion dated April 17, 1986, the court granted the motion. The court reasoned that the only persons authorized by the Mine Safety Act to order a withdrawal of workers from the mine are designees of the Division of Mines. Mr. Davis, in demanding a withdrawal of miners from inby "D" track, acted exclusively under authority conferred upon him by the wage agreement. Thus, his remedy was controlled by the wage agreement and not by the Mine Safety Act. A final order incorporating the opinion was entered on July 28, 1986, and this appeal followed.

---

7. Art. III, § d of the wage agreement provides a mechanism for removal of safety committeemen. It reads in part:

"If the Mine Health and Safety Committee in closing down an area of the mine acts arbitrarily and capriciously, a member or members of such Committee may be removed from the Committee. An Employer seeking to remove a Committee member shall so notify the affected Committeeman and the other members of the Mine Health and Safety Committee. If the Committee objects to such removal, the matter shall be submitted directly to arbitration within 15 days. If the other members of the Committee so determine, the affected member shall remain on the Commit-

tee until the case is submitted to and decided by the appropriate panel arbitrator. If the Employer requests removal of the entire Committee, the matter automatically shall be submitted to arbitration and the Committee will continue to serve until the case is submitted to and decided by the arbitrator. A Committee member shall not be suspended or discharged for his official actions as a Committee member."

8. Formerly W.Va.Code, 22–2–60.

9. The injunction did not require reinstatement, but did allow Mr. Davis to run for reelection to his post on March 18, 1984.

## II.

Mining is by nature a hazardous industry. For this reason the Legislature has, through the enactment of mine safety legislation, adopted a strong public policy to insure the safety of personnel employed in mines throughout the State. We spoke to this point in *United Mine Workers of America v. Miller*, 170 W.Va. 177, 291 S.E.2d 673 (1982), summarizing the law in Syllabus Point 4:

"The Legislature has established a clear and unequivocal public policy that the [Division] of Mines shall have as its primary purpose 'the protection of the safety and health of persons employed within or at the mines of this state.' W.Va.Code § 22-1-2 (1981 Replacement Vol.)." [10]

*See also*, Syllabus Point 1 of *State ex rel. Perry v. Miller*, 171 W.Va. 509, 300 S.E.2d 622 (1983).

Our Mine Safety Act, W.Va.Code, 22A-1-1, *et seq.* (1985), provides comprehensive regulation of all aspects of mine health and safety. At the heart of the Act is a system of periodic mine inspections which provides a mechanism for enforcement of safety mandates. State mine inspectors are given a wide range of authority and may cite safety violations, issue orders to abate violations and dangerous conditions, and order the withdrawal of miners from areas of imminent danger. W.Va.Code, 22A-1A-13.[11]

The Legislature has also recognized miner participation as an indispensable adjunct to the enforcement process. As we empha-sized in *Miller*: "Only those who work in the mine and are familiar with the day to day operations, are likely to have knowledge of the possible location of safety and health hazards." 170 W.Va. at 182, 291 S.E.2d at 678. The Mine Safety Act guarantees miners a role in safety enforcement in two important ways. First, a miner representative is specifically authorized to accompany State inspectors during mine examinations. Second, any miner "may request the [State] to have an immediate investigation" of alleged safety violations. W.Va.Code, 22A-1A-12.[12]

It is beyond peradventure that the purposes of the Mine Safety Act would be jeopardized if employers were permitted to retaliate against miners who participated in safety enforcement. To promote the fullest possible participation by miners, W.Va. Code, 22A-1A-20 prohibits retaliatory conduct by employers against mine employees because of their reporting of violations of the Mine Safety Act. It provides, in part:

"No person shall discharge or in any other way discriminate against or cause to be discharged or discriminated against any miner or any authorized representative of miners by reason of the fact that he believes or knows that such miner or representative ... has notified the commissioner, his authorized representative, or an operator, directly or indirectly, of any alleged violation or danger[.]" [13]

We recently discussed the reach of W.Va.Code, 22A-1A-20 in *Miller*. There, the United Mine Workers of America challenged a practice whereby employers withheld the pay of miner representatives who

---

**10.** W.Va.Code, 22A-1A-2 (1985), carries this same theme:

"The division of mines and minerals ... shall give prime consideration to the protection of the safety and health of persons employed within or at the mines of this state."

**11.** Formerly W.Va.Code, 22-1-14.

**12.** Formerly W.Va.Code, 22-1-13.

**13.** This provision is patterned upon § 105(c) of the Federal Mine Safety and Health Act of 1977, 30 U.S.C. § 815(c), which in pertinent part provides:

"No person shall discharge or in any manner discriminate against or cause to be discharged or cause discrimination against or otherwise interfere with the exercise of the statutory rights of any miner, representative of miners or applicant for employment in any coal or other mine subject to this [Act] because such miner, representative of miners or applicant for employment has filed or made a complaint under or related to this Act, including a complaint notifying ... of an alleged danger or safety or health violation in a coal or other mine, or ... because of the exercise by such miner, representative of miners or applicant for employment on behalf of himself or others of any statutory right afforded by this [Act]."

accompanied State mine inspectors. This practice was alleged to be discriminatory upon the ground it penalized miners who exercised a right conferred by the Mine Safety Act. We unanimously agreed. The Act expressly authorizes miner representatives to accompany State inspectors, and a miner who does so renders a service to the operator, his fellow miners, and the State. To deny compensation to a miner representative for that service would frustrate the plan of miner participation which undergirds the Act. We concluded: "Miner representatives must not be required to forego compensation when they seek to aid enforcement of laws which benefit not only the miner and the State, but the operators as well." 170 W.Va. at 182–183, 291 S.E.2d at 679.

### III.

■ We must decide as a threshold matter whether Mr. Davis was engaged in a "protected activity," that is, an activity for which discrimination is prohibited by W.Va. Code, 22A–1A–20. Kitt argues that Mr. Davis' right to demand a withdrawal of miners derives solely from the wage agreement. Since the method of his removal was provided for under the agreement, his remedy for improper removal was likewise controlled by the agreement. Mr. Davis rejoins that his withdrawal demand was a verbal report of a safety hazard and, therefore, a protected activity under the Mine Safety Act. A miner's universe of safety, he points out, is a mixture of statutory and contract guarantees. A miner who communicates a potential safety hazard to his employer, even under authority of contract, must be deemed to be protected against discrimination where the hazard is one covered by the Mine Safety Act.

We agree with Mr. Davis that mine safety is regulated by a dual system of rules which substantially overlap. Kitt asks us to divide a miner's world into separate and mutually exclusive spheres, so that protection against discrimination is available only where the miner has authority to act under the Mine Safety Act. This we are unable to do. We cannot simply ignore the reality of the workplace. Miners bargain for and secure valuable safety rights which are memoralized in the wage agreement. These rights do not exist in a vacuum, but are intimately bound up with rights arising under the Mine Safety Act.

The right at issue here, that of a safety committeeman to demand a withdrawal of miners, is unquestionably one of contract. Yet, while the right is not specifically recognized by the Mine Safety Act, it invariably is triggered by safety conditions which are regulated by the Act. The wage agreement does not detail what safety violations will support a withdrawal and these conditions must be determined by reference to the Mine Safety Act. Similarly, the reasonableness of the exercise of the right is determined by reference to the hazard covered in the Mine Safety Act.

Furthermore, the right to discipline is also drawn into the Mine Safety Act by the discrimination statute, W.Va.Code, 22A–1A–20. It may well be that a miner who acts arbitrarily and capriciously with regard to reporting a safety violation is subject to disciplinary measures and would not be able to claim the benefit of W.Va.Code, 22A–1A–20. However, the issue of the reasonableness of his action is the focal inquiry.

This standard is analogous to that fashioned by courts under the Federal Mine Health and Safety Act, which has been interpreted to permit a miner to refuse to work in an area of the mine or to use equipment which is believed to be hazardous. *E.g., Consolidation Coal Co. v. Marshall*, 663 F.2d 1211 (3rd Cir.1981); *Consolidation Coal Co. v. Federal Mine Safety & Health Review Comm'n*, 795 F.2d 364 (4th Cir.1986); *Miller v. Federal Mine Safety & Health Review Comm'n*, 687 F.2d 194 (7th Cir.1982); *see generally*, Biddle, Means & Levine, Protected Work Refusals Under Section 105(c)(1) of the Mine Safety and Health Act, 89 W.Va.L.Rev. 629 (1987) (citing cases); 6 Am.L. of Mining, § 201.-04[4][b] (2d ed. 1984); Annot., 67 A.L.R. Fed. 554 (1984).

The Seventh Circuit Court of Appeals in *Miller*, after conceding that "nowhere does

the Act explicitly entitle a worker to stop work because conditions are unsafe" went on to approve this statement from *Marshall:*

" '[L]egislative history ... supports a right to refuse work in the event that the miner possesses a reasonable, good faith belief that specific working conditions or practices threaten his safety or health.' [663 F.2d] at 1217 n. 6. We agree that there is such a right." 687 F.2d at 195.

In each of the foregoing cases this reasonable, good faith belief standard was utilized to determine whether the employer could discharge or otherwise discriminate against a miner under the Federal Act. 30 U.S.C. § 815(c).[14] It is apparent that the standard in the wage agreement, allowing discharge or other disciplinary measures if the employee acts in an arbitrary and capricious manner, is simply the mirror image of the statutory rule that disciplinary action may not be taken if the employee has a reasonable, good faith belief that a dangerous condition existed.

The fact that the wage agreement provides for an arbitration mechanism to resolve disciplinary disputes does not compel a conclusion of exclusivity where the same operative facts are within the discrimination statute. The United States Supreme Court has considered on several occasions whether rights arising from a collective bargaining or wage agreement can in effect supplant or diminish statutory rights, and has concluded that they may not. *E.g., McDonald v. City of West Branch,* 466 U.S. 284, 104 S.Ct. 1799, 80 L.Ed.2d 302 (1984); *Barrentine v. Arkansas–Best Freight System, Inc.,* 450 U.S. 728, 101 S.Ct. 1437, 67 L.Ed.2d 641 (1981); *Alexander v. Gardner–Denver Co.,* 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974). *Barrentine* involved a wage agreement that conflicted in part with the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201 *et seq.* The Court stated:

"[W]e have held that FLSA rights cannot be abridged by contract or otherwise waived because this would 'nullify the purposes' of the statute and thwart the legislative policies it was designed to effectuate." (Citations omitted.) 450 U.S. at 740, 101 S.Ct. at 1445, 67 L.Ed.2d at 653.

Much the same point had been made earlier in *Gardner–Denver* which involved the arbitration of a discharge dispute under a collective bargaining that resulted in an adverse decision against the employee. A subsequent proceeding was brought by the employee under Title VII of the Civil Rights Act of 1964, claiming the discharge was racially motivated. The employer contended that the employee by seeking arbitration had waived any Title VII claim, but this was rejected by the Supreme Court:

"Title VII, on the other hand, stands on plainly different ground; it concerns not majoritarian processes, but an individual's right to equal employment opportunities. Title VII's strictures are absolute and represent a congressional command that each employee be free from discriminatory practices. Of necessity, the rights conferred can form no part of the collective-bargaining process since waiver of these rights would defeat the paramount congressional purpose behind Title VII. In these circumstances, an employee's rights under Title VII are not susceptible of prospective waiver." 415 U.S. at 51–52, 94 S.Ct. at 1021, 39 L.Ed.2d at 160.

We, therefore, conclude that a mine safety committeeman who communicates a safety violation under the Mine Safety Act and enforces a procedural right given under the collective bargaining wage agreement, and who thereafter is subject to discrimination by his employer as a result thereof, is entitled to assert the protections afforded by W.Va.Code, 22A–1A–20. We conclude that the Board could consider the matter.

## IV.

■ The final issue we address is whether the prior arbitration decision precludes further litigation under the discrimination statute, W.Va.Code, 22A–1A–20. We be-

---

**14.** *See* Note 13, *supra,* for the relevant language of 30 U.S.C. § 815(c).

lieve it does not under *Gardner–Denver* and its progeny. In *Gardner–Denver* the Supreme Court framed the issue in this fashion: "[W]e must decide under what circumstances, if any, an employee's statutory right ... under Title VII may be foreclosed by prior submission of his claim to final arbitration under the nondiscrimination clause of a collective-bargaining agreement." 415 U.S. at 38, 94 S.Ct. at 1015, 39 L.Ed.2d at 152.

The issue here is procedural in nature, and centers upon the preclusive effect which must be given to a prior arbitration award. The Supreme Court in *Gardner–Denver* began by analyzing the role of an arbitrator under a collective bargaining agreement, stating that:

> "His source of authority is the collective-bargaining agreement, and he must interpret and apply that agreement in accordance with the 'industrial common law of the shop'.... The arbitrator, however, has no general authority to invoke public laws that conflict with the bargain between the parties[.]" 415 U.S. at 53, 94 S.Ct. at 1022, 39 L.Ed.2d at 161.

The Court also pointed out that the arbitration process itself was "comparatively inferior to judicial processes" in affording procedural safeguards, and that an arbitrator's competence "pertains primarily to the law of the shop, not the law of the land." [15] 415 U.S. at 57, 94 S.Ct. at 1024, 39 L.Ed.2d at 163.

More importantly, the Court spoke of statutory rights that were absolute and "represent[ed] a congressional command that each employee be free from discriminatory practices." It observed that the "rights conferred [by statute] can form no part of the collective-bargaining process since waiver of these rights would defeat the paramount congressional purpose...." 415 U.S. at 51, 95 S.Ct. at 1021, 39 L.Ed.2d at 160.

In *Barrentine*, where the claim involved inconsistencies in pay between the collective bargaining agreement and the minimum wage law, the Court declined to accord any binding effect to the arbiter's decision, stating:

> "While courts should defer to an arbitral decision where the employee's claim is based on rights arising out of the collective-bargaining agreement, different considerations apply where the employee's claim is based on rights arising out of a statute designed to provide minimum substantive guarantees to individual workers." 450 U.S. at 737, 101 S.Ct. at 1443, 67 L.Ed.2d at 651.

We are persuaded by the foregoing authority that arbitration under the wage agreement does not preclude a separate proceeding as authorized by W.Va.Code, 22A–1A–20. The specialized expertise of the agency, coupled with the compelling public policy expressed in our Mine Safety Act, forecloses the issue preclusion claim.[16] We, therefore, hold that a miner against

---

**15.** In Note 19 of *Gardner–Denver*, the Supreme Court made these further observations regarding the inherent weakness of the arbitration process on individual claims:

> "A further concern is the union's exclusive control over the manner and extent to which an individual grievance is presented. *See Vaca v. Sipes*, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967); *Republic Steel Corp. v. Maddox*, 379 U.S. 650, 85 S.Ct. 614, 13 L.Ed.2d 580 (1965). In arbitration, as in the collective-bargaining process, the interests of the individual employee may be subordinated to the collective interests of all employees in the bargaining unit. *See J.I. Case Co. v. NLRB*, 321 U.S. 332, 64 S.Ct. 576, 88 L.Ed. 762 (1944). Moreover, harmony of interest between the union and the individual employee cannot always be presumed, especially where a claim of racial discrimination is made. *See, e.g.,*

*Steele v. Louisville & N. R. Co.*, 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944); *Tunstall v. Brotherhood of Locomotive Firemen & Enginemen*, 323 U.S. 210, 65 S.Ct. 235, 89 L.Ed. 187 (1944). And a breach of the union's duty of fair representation may prove difficult to establish. *See Vaca v. Sipes, supra; Humphrey v. Moore*, 375 U.S. 335, 342, 348–351, 84 S.Ct. 363, 367, 371–373, 11 L.Ed.2d 370 (1964)." 415 U.S. at 58 n. 19, 94 S.Ct. at 1024–25 n. 19, 39 L.Ed.2d at 164 n. 19.

**16.** It is because of this strong statutory policy that our commercial arbitration law, which favors arbitration, is inapplicable as it deals with rights arising from a contract. *E.g., Clinton Water Ass'n v. Farmers Const. Co.*, 163 W.Va. 85, 254 S.E.2d 692 (1979); *Board of Education v. W. Harley Miller, Inc.*, 160 W.Va. 473, 236 S.E.2d 439 (1977).

whom an arbitration decision has been rendered under a collective bargaining agreement involving a safety claim is not foreclosed from pursuing a discrimination remedy under W.Va.Code, 22A–1A–20.

▐ In this respect, the circuit court erred in holding that the Board was without jurisdiction to consider the claim. While the arbitrator's decision has no preclusive effect, the *Gardner–Denver* line of cases recognizes that the decision is admissible and should be given such weight as the agency or court that hears the claim believes appropriate. In this regard, we adopt Note 21 of *Gardner–Denver*.[17]

It does not appear that the Board gave any consideration to the arbitrator's decision. Consequently, upon remand to the circuit court, it in turn should remand the case to the Board. This will enable the Board to consider the decision in the light of Note 21 of *Gardner–Denver*, giving it such weight as it deems appropriate, and then to issue its decision accordingly.

Reversed and remanded with directions.

NEELY, Justice, dissenting:

I dissent from the majority opinion because the circuit court was correct in holding that the Coal Mine Health & Safety Board of Appeals had no jurisdiction in the present case because Mr. Davis' claim had been fully and fairly litigated through the arbitration mechanism provided by the bargained-for wage agreement, the terms of which were fully in accord with the Mine Safety Act.

Respondent employer's collective bargaining agreement with petitioner Davis' union authorized the arbitration of any grievance that arose from the interpretation or application of the agreement's terms. One section of the wage agreement specifically provides a mechanism for removal of safety committeemen. *See* Art. III, § d of the National Bituminous Coal Wage Agreement of 1981. Mr. Davis' grievance was submitted to arbitration and the arbitrator determined that Mr. Davis' safety demand was arbitrary and capricious, as it was contrary to the findings of the mine inspectors and unsupported by objective evidence. There was no evidence offered that the employer had retaliated against Mr. Davis because of his participation in safety enforcement. The majority opinion offers no evidence that there was anything wrong with the arbitration process or any reason for the arbitrator's decision to be vacated except for a vague appeal to "public policy."

In *Paperworkers v. Misco, Inc.*, 484 U.S. 29, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987), the U.S. Supreme Court strongly reaffirmed the principle that courts may not overturn labor arbitration awards on public policy grounds unless the public policy invoked is "well defined and dominant" under existing law. The Supreme Court in *Paperworkers* made clear that courts play only a limited role when asked to review the decision of an arbitrator:

> The function of the court is very limited when the parties have agreed to submit all questions of contract interpretation to the arbitrator. It is confined to ascertaining whether the party seeking arbitration is making a claim which on its face is governed by the contract.

---

**17.** Note 21 of *Gardner–Denver* has been modified by the brackets so as to reflect a state statutory right rather than Congress' Title VII claim:

"We adopt no standards as to the weight to be accorded an arbitral decision, since this must be determined in the court's discretion with regard to the facts and circumstances of each case. Relevant factors include the existence of provisions in the collective-bargaining agreement that conform substantially with [W.Va.Code, 22A–1A–20], the degree of procedural fairness in the arbitral forum, adequacy of the record with respect to the issue of discrimination, and the special competence of particular arbitrators. Where an arbitral determination gives full consideration to an employee's [statutory] rights, a court may properly accord it great weight. This is especially true where the issue is solely one of fact, specifically addressed by the parties and decided by the arbitrator on the basis of an adequate record. But courts should ever be mindful that [the Legislature] in enacting [the statute], thought it necessary to provide a judicial forum for the ultimate resolution of discriminatory [employment] claims. It is the duty of courts to assure the full availability of this forum."

Whether the moving party is right or wrong is a question of contract interpretation for the arbitrator. *In these circumstances the moving party should not be deprived of the arbitrator's judgment, when it was his judgment and all that it connotes that was bargained for.*

*The courts, therefore, have no business weighing the merits of the grievance,* considering whether there is equity in a particular claim, or determining whether there is particular language in the written instrument which will support the claim. [Emphasis added]

*Paperworkers, supra,* at 36–37, 108 S.Ct. at 370, citing *Steelworkers v. American Mfg. Co.,* 363 U.S. 564, 567–568, 80 S.Ct. 1343, 1346, 4 L.Ed.2d 1403; *see also, AT & T Technologies, Inc. v. Communication Workers,* 475 U.S. 643, 649–650, 106 S.Ct. 1415, 1418–1419, 89 L.Ed.2d 648 (1986).

The reasons for insulating arbitral decisions from judicial review are grounded in the federal statutes regulating labor-management relations. These statutes reflect a decided preference for private settlement of labor disputes without the intervention of government. The Labor Management Relations Act of 1947, 61 Stat. 153, 29 U.S.C. § 173(d) provides that "final adjustment by a method agreed upon by the parties is hereby declared to be the desirable method for settlement of grievance disputes arising over the application or interpretation of an existing collective bargaining agreement." The courts have jurisdiction to enforce collective bargaining contracts; but where the contract provides grievance and arbitration procedures those procedures must be exhausted and courts must order resort to the private settlement mechanisms without dealing with the merits of the dispute. As the *Paperworks* case asserts:

Where it is contemplated that the arbitrator will determine remedies for contract violations that he finds, courts have no authority to disagree with his honest judgment in that respect. If the courts were free to intervene on these grounds, *the speedy resolution of grievances by private mechanisms would be greatly undermined.* [Emphasis added]

484 U.S. at 38, 108 S.Ct. at 371.

The W.Va. Supreme Court of Appeals in *Board of Education v. W. Harley Miller,* 160 W.Va. 473, 236 S.E.2d 439 (1977) began enforcing arbitration awards among commercial parties as an alternative to litigation. *See also, Clinton Water Association v. Farmers Construction Co.,* 163 W.Va. 85, 254 S.E.2d 692 (1979); *Barber v. Union Carbide,* 172 W.Va. 199, 304 S.E.2d 353 (1983); *State ex rel. Ranger Fuel Corporation v. Lilly,* 165 W.Va. 98, 267 S.E.2d 435 (1980); *Baker Mine Service, Inc. v. Nutter,* 171 W.Va. 770, 301 S.E.2d 860 (1983); *Local Division No. 812 of Clarksburg, W.Va., of the Amalgamated Transit Union v. Central W.Va. Transit Authority,* 179 W.Va. 31, 365 S.E.2d 76 (1987). In *Harley Miller,* we decided that the circuit court erred in not enforcing the arbitrators' award as "all arbitration provisions in all contracts which indicate that the parties intended to arbitrate their differences rather than litigate them are presumptively binding and specifically enforceable." 160 W.Va. at 487–488, 236 S.E.2d at 447–448.

Furthermore, in our most recent opinion concerning arbitration, we addressed whether a discharge from employment was covered under the union's collective bargaining agreement. In *Local Division No. 812, supra,* we held:

In determining whether or not the parties to a collective bargaining agreement have agreed to submit a particular issue to arbitration, it must be recognized that there is a presumption favoring arbitration, and this presumption may be rebutted only where it can be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.

179 W.Va. at 35, 365 S.E.2d at 80.

Indeed, the majority's position that the appellant's rights under *W.Va.Code,* 22A-1A-20 [1985] are separate from his rights under the collective bargaining agreement contains a germ of formalistic logic. However, in analogous situations courts have almost uniformly held that principles of

collateral estoppel should be applied. *See,* for example, *Zelle v. Chicago & N. W. R. Co.,* 242 Minn. 439, 65 N.W.2d 583 (1954); *Silva v. Mercier,* 33 Cal.2d 704, 204 P.2d 609 (1949); *Monte v. Southern Delaware County Authority,* 335 F.2d 855 (3d Cir. Pa.1964); *Ficek v. Southern Pacific Co.,* 338 F.2d 655 (9th Cir.Or.1964), *cert. denied* 380 U.S. 988, 85 S.Ct. 1362, 14 L.Ed.2d 280 (1965); *Jones v. Kvistad,* 19 Cal.App.3d 836, 97 Cal.Rptr. 100 (1st Dist.1971); *General Constr. Co. v. Hering Realty Co.,* 201 F.Supp. 487 (E.D.S.C.1962) *app. dismd.* 312 F.2d 538 (4th Cir.S.C.1963); *Torano v. Motor Vehicle Accident Indemnification Corp.,* 19 App.Div.2d 356, 243 N.Y.S.2d 434 (1963), *aff'd,* 15 N.Y.2d 882, 258 N.Y.S.2d 418, 206 N.E.2d 353 (1965); *Sweeney v. Morganroth,* 451 F.Supp. 367 (S.D.N.Y.1978); *Maidman v. O'Brien,* 473 F.Supp. 25 (S.D.N.Y.1979); *Orchard Park Teachers Asso. v. Board of Education,* 71 A.D.2d 1, 421 N.Y.S.2d 494 (1979); *General Tel. Co. v. Communications Workers of America,* 648 F.2d 452 (6th Cir. Ohio 1981); *Kingsley v. Redevco Corp.,* 61 N.Y.2d 714, 472 N.Y.S.2d 610, 460 N.E.2d 1095 (1984); *Ray Wilson Co. v. Anaheim Memorial Hospital Assn.,* 166 Cal.App.3d 1081, 213 Cal.Rptr. 62 (2d Dist.1985); *Broward County Paraprofessional Asso. v. McComb,* 394 So.2d 471 (Fla.App. 4th Dist. 1981); *Tucker v. General Tel. Co.,* 50 N.C.App. 112, 272 S.E.2d 911 (1980).

In Syllabus Point 3 of *Mellon-Stuart Co. v. Hall,* 178 W.Va. 291, 359 S.E.2d 124 (1987), Justice Miller wrote for a unanimous court:

> An assessment of three factors is ordinarily made in determining whether *res judicata* and collateral estoppel may be applied to a hearing body: (1) whether the body acts in a judicial capacity; (2) whether the parties were afforded a full and fair opportunity to litigate the matters in dispute; and (3) whether applying the doctrine is consistent with the express or implied policy in the legislation which created the body.

359 S.E.2d at 126. Clearly, if these three criteria are applied to the present case, the majority should have accorded *res judicata* effect to the arbitrator's decision. First, the arbitrator by contract, acted in a judicial capacity. Second, both parties agreed to arbitrate and had a full and fair opportunity to present their factual and legal positions to the arbitrator. Nowhere in the record does the appellant assert that the arbitrator was corrupt; the appellant merely disliked the end result and wanted to do the whole thing again before the Safety Board. Third, holding that the arbitration ruling is binding would be consistent with the express policy of this Court favoring cheap, efficient, and expeditious arbitration over expensive, cumbersome and time consuming litigation. *See Board of Education v. W. Harley Miller, supra,* and its progeny. Finally, the arbitration proceeding in this case is a duplicate of what occurred before the Board. The parties were identical; the issue to be decided was identical; the evidence was identical; and, the legal standard was identical.

There was no reason to give the appellant another bite at the same apple simply because this court wants mines to be safe. Safety is nowhere an issue in this case. The arbitrator has determined that the appellant *abused* his prerogatives as a safety committeeman and that his actions proceeded from improper motives: that was the issue to be decided and there is no reason to believe that the Board decided it better than the arbitrator. At some point litigation should cease: litigation, *per se,* is expensive, vexatious, and generally undesirable. Whenever the system can provide less rather than more litigation without sacrificing fairness, that should be its goal.

I am authorized to say that Justice BROTHERTON joins in this dissent.