Workman and Starcher, JJ., filed separate opinions dissenting in part and concurring in part.

506 S.E.2d 578

**Betty A. TIERNAN, Plaintiff Below, Appellant,**

**v.**

**CHARLESTON AREA MEDICAL CENTER, INC., a West Virginia Corporation, Defendant Below, Appellee.**

**No. 24434.**

Supreme Court of Appeals of West Virginia.

Submitted Feb. 17, 1998.

Decided May 21, 1998.

Dissenting and Concurring Opinion of Justice Starcher June 2, 1998.

Concurring Opinion of Justice McCuskey June 29, 1998.

Dissenting and Concurring Opinion of Justice Workman July 21, 1998.

Walt Auvil, Pyles & Auvil, Parkersburg, for Appellant.

Stephen A. Weber, Dina M. Mohler, Kay, Casto, Chaney, Love & Wise, Charleston, for Appellee.

DAVIS, Chief Justice:

This is an appeal by Betty A. Tiernan, appellant/plaintiff, (hereinafter "Ms. Tiernan") from two orders entered by the Circuit Court of Kanawha County granting summary judgment to Charleston Area Medical Center, appellee/defendant, (hereinafter "CAMC"). The plaintiff asserted numerous theories of liability regarding the termination of her employment by CAMC. The circuit court made the following rulings on those theories: that as a matter of law Ms. Tiernan's constitutional theories of liability did not apply to a private employer; that Ms. Tiernan's statutory claims placed no genuine issue of material fact in dispute; and that the theories of breach of contract/detrimental reliance, tortious interference with a business relationship, and violation of statutory and regulatory public policies were not supported by evidence sufficient to raise genuine issues of material fact. Ms. Tiernan assigns error to each of the circuit court's rulings on her claims for recovery. We find that the circuit court correctly granted summary judgment on Ms. Tiernan's constitutional claims. We further find that the circuit court correctly granted summary judgment on Ms. Tiernan's claim for tortious interference with a business relationship; and that the circuit court's orders failed to present adequate findings for review by this Court on all remaining claims. Consequently, we affirm in part and reverse in part the circuit court's summary judgment orders.

## I.

### FACTUAL AND PROCEDURAL BACKGROUND

This case arose as a result of Ms. Tiernan's discharge from employment by CAMC. Ms. Tiernan was employed as a nurse by CAMC from May of 1985 to May 2, 1994. Prior to 1994, Ms. Tiernan had a good relationship with CAMC. She had an excellent work history and was part of CAMC's management staff.

On February 19, 1994, Ms. Tiernan wrote a letter to the editor of The Charleston Gazette. The letter was edited and published in the newspaper on February 23, 1994.[1] The

---

1. The edited version of Ms. Tiernan's letter appeared in the newspaper as follows:

**Readers' forum**
**Compassion will survive**

Editor the Gazette:.
This is a letter of appreciation to Charleston Area Medical Center for slowly but surely lowering morale in the work place to an unbeliev-

letter criticized CAMC's budgetary cutbacks. CAMC officials spoke with Ms. Tiernan about the letter and cautioned her to consult with CAMC in the future, before airing her views in the press. CAMC advised Ms. Tiernan that, as part of the management team, she had a duty to portray to the public and other staff members that management was united. Ms. Tiernan was informed that no repercussions would be taken against her for the letter.[2] A few weeks after the letter appeared in the newspaper, Ms. Tiernan was given an evaluation. Ms. Tiernan was rated by CAMC as "meets" or "exceeds" on each of the evaluation categories. The evaluation also noted that Ms. Tiernan needed to be more supportive of management. Ms. Tiernan was given a raise after the evaluation.

On May 2, 1994, CAMC scheduled a non-public meeting to discuss a planned merger or affiliation with St. Francis Health Care Systems, Inc. The meeting was to be televised on CAMC's internal, closed-circuit television station. The broadcast was specifically limited to viewing at television screens located at employee workstations. Furthermore, the broadcast was blocked from patient television. CAMC planned to hold a news conference immediately after the meeting to inform the general public of the proposed affiliation agreement. CAMC invited only specific upper and middle managers to the meeting. The invitation did not include members of the media.

Shortly after the meeting began, Ms. Tiernan entered the room where the meeting was being held accompanied by a newspaper reporter.[3] A CAMC employee standing at the door did not recognize Ms. Tiernan; but, recognized the reporter. The employee informed the reporter she could not enter the meeting. The reporter stated that she was invited by Ms. Tiernan. Ms. Tiernan and the reporter entered the meeting. Both Ms. Tiernan and the newspaper reporter had tape recorders and recorded the meeting.

CAMC terminated Ms. Tiernan several hours after the meeting. CAMC's basis for termination was that Ms. Tiernan's conduct of bringing the newspaper reporter to a closed meeting was wrong and warranted dismissal. Ms. Tiernan invoked CAMC's appeal procedures. Her appeal was unsuccessful.

After termination, Ms. Tiernan secured per diem employment as a nursing supervisor with Arthur B. Hodges Center, Inc., (hereinafter "ABHC") a geriatric patient nursing home affiliated with CAMC.[4] When CAMC learned of Ms. Tiernan's employment with ABHC, CAMC contacted ABHC and informed ABHC that Ms. Tiernan was also

able level; for cutting the nurses' merit raise scale from a ceiling of 8 percent to 4 percent annually; for decreasing their matching funds for our retirement accounts; for reducing the educational assistance and conference monies to employees who wish to pursue a higher level of learning and professionalism.

Thank you for losing sight of the fact that your employees have a life outside of CAMC; that we have homes, families and friends; that we need and are deserving of recuperative time away from this institution. Thank you, too, for creating in me a level of cynicism I never dreamed possible.

However, CAMC, there is one thing you cannot do. And that is destroy the compassion and caring I have for my patients and their families. I will continue to deliver the highest standard of care I possibly can. I will continue to respect and support my fellow nurses in their endeavors. I will still feel the joy of a patient's healing and grieve for the ones we lose; and with my patients and families I will share a touch, a confidence and more than a few tears.

But, CAMC, bear in your mind and corporate heart, I will not share these things with you.
Betty A. Tiernan, R.N., 3711 Virginia Ave., City

2. It appears that Ms. Tiernan informed CAMC that the newspaper did not print the real issue of concern she expressed in her unedited letter. That issue involved the on-call work policy for nurses. CAMC revised its on-call policy subsequent to Ms. Tiernan informing CAMC of her dissatisfaction with the on-call policy.

3. Ms. Tiernan initially took the newspaper reporter to one of the television broadcasting stations. However, because of apparent sound problems Ms. Tiernan decided to take the newspaper reporter to the actual meeting.

4. The exact nature of CAMC's relationship with ABHC is not clear from the record. It appears that the Administrator of ABHC was actually employed by CAMC. However, it does not appear that CAMC controlled the hiring and termination decisions of ABHC.

working as a union organizer.[5] ABHC provided no further work for Ms. Tiernan upon learning of her union activities.

Ms. Tiernan filed suit against CAMC on February 2, 1995. Ms. Tiernan's complaint asserted (1) that her termination violated public policy embodied in the state constitutional right to free speech and association; (2) that in terminating her, CAMC breached their oral contract not to retaliate against her for publishing the February 19, 1994, letter and that she detrimentally relied upon the agreement; (3) that CAMC tortiously interfered with her business relationship with ABHC; and (4) that Ms. Tiernan's termination by/from CAMC resulting from inadequate patient to nurse ratio [6] was a matter of substantial concern and therefore violative of public policy.

After the parties conducted discovery, CAMC moved for summary judgment. The circuit court initially granted summary judgment to CAMC on Ms. Tiernan's constitutional theories and the theory of tortious interference with a business relationship. The circuit court reserved ruling on the other theories. Ultimately, the circuit court granted CAMC summary judgment on the remaining theories.[7] It is from the circuit court's two summary judgment orders that Ms. Tiernan now appeals.

## II.

### STANDARD OF REVIEW

■ This Court stated in syllabus point 1 of *Painter v. Peavy*, 192 W.Va. 189, 451 S.E.2d 755 (1994), that "[a] circuit court's entry of summary judgment is reviewed de novo." We have held that "[a] motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the

facts is not desirable to clarify the application of the law." Syl. Pt. 3, *Aetna Casualty & Surety Co. v. Federal Ins. Co. of N.Y.*, 148 W.Va. 160, 133 S.E.2d 770 (1963). Of course, "[t]he mere fact that a particular cause of action contains elements which typically raise a factual issue for jury determination does not automatically immunize the case from summary judgment. The plaintiff must still discharge his or her burden under West Virginia Rule of Civil Procedure 56(c) by demonstrating that a legitimate jury question, i.e. a genuine issue of material fact, is present." Syl. Pt. 1, *Jividen v. Law*, 194 W.Va. 705, 461 S.E.2d 451 (1995). This Court indicated in syllabus point 5 of *Jividen* that:

> Roughly stated, a "genuine issue" for purposes of West Virginia Rule of Civil Procedure 56(c) is simply one half of a trialworthy issue, and a genuine issue does not arise unless there is sufficient evidence favoring the non-moving party for a reasonable jury to return a verdict for that party. The opposing half of a trialworthy issue is present where the non-moving party can point to one or more disputed "material" facts. A material fact is one that has the capacity to sway the outcome of the litigation under the applicable law.

## III.

### DISCUSSION

#### A.

### *State Constitutional Free Speech Claim*

■ Ms. Tiernan contended before the lower court that she was terminated because of the publication of her letter criticizing budgetary cuts by CAMC. The circuit court found as a matter of law that the Free Speech Clause of the state constitution does not apply to private employers.[8] Ms. Tier-

---

5. Ms. Tiernan was employed as a union organizer for a few months after losing her job with CAMC.

6. Ms. Tiernan was allowed to amend her complaint by court order on August 13, 1996, to add the claim that her termination resulted from her protests about inadequate patient-to-nurse ratios.

7. The circuit court issued two separate orders granting the defendant summary judgment.

Both orders were entered on September 30, 1996.

8. Ms. Tiernan did not argue before the circuit court, nor does she contend before this Court that the federal constitutional First Amendment right to free speech was a basis of public policy. *See Hudgens v. NLRB*, 424 U.S. 507, 513, 96 S.Ct. 1029, 47 L.Ed.2d 196 (1976) (holding federal constitutional provision guaranteeing free speech does not extend to private conduct). Our

nan argues[9] that the basis for her firing violated a substantial public policy embedded in the state constitutional right to free speech[10] contained in W.Va. Const. Art. 3, Sec. 7.[11] In this case, Ms. Tiernan was an at-will employee of a private sector employer. This Court has generally held that "[a]t will employees, as well as other employees, have certain protections in circumstances involving public policy." *Cordle v. General Hugh Mercer Corp.*, 174 W.Va. 321, 325, 325 S.E.2d 111, 114 (1984). "A determination of the existence of public policy in West Virginia is a question of law, rather than a question of fact for a jury." Syl. pt. 1, *Cordle.* CAMC argued that any public policy contained in the state constitutional Free Speech Clause is inapplicable to private sector employers. This issue is one of first impression for this Court.

**Public Policy In General.** Twenty years ago this Court held that "[t]he rule that an employer has an absolute right to discharge an at will employee must be tempered by the principle that where the employer's motivation for the discharge is to contravene some substantial public policy princip[le], then the employer may be liable to the employee for damages occasioned by this discharge." Syl., *Harless v. First National Bank*, 162 W.Va. 116, 246 S.E.2d 270 (1978). In syllabus point 2 of *Birthisel v. Tri–Cities Health Services Corp.*, 188 W.Va. 371, 424 S.E.2d 606 (1992), we held that "[t]o identify the sources of public policy for purposes of determining whether a retaliatory discharge has occurred, we look to established precepts in our constitution, legislative enactments, legislatively approved regulations, and judicial opinions." Numerous courts in other jurisdictions, in making a determination of whether a public policy standard has been violated, unanimously take the position that public policy has to be preexisting and germinate from constitutional, statutory or regulatory provisions or prior judicial decisions.[12] It was

---

analysis, therefore, is confined to the Free Speech Clause of the state constitution.

9. Ms. Tiernan submitted her petition for appeal as her brief in this case. CAMC filed a response to the petition as well as an appeal brief. Ms. Tiernan filed a reply brief.

10. Ms. Tiernan's brief does not address the argument regarding allegations in her complaint that her constitutional right to association was violated. Nor does the brief set forth an argument regarding the alleged denial of constitutional due process in failing to hold a pre-termination hearing. Issues not raised on appeal or merely mentioned in passing are deemed waived. *See* Syl. Pt. 6, *Addair v. Bryant*, 168 W.Va. 306, 284 S.E.2d 374 (1981) ("Assignments of error that are not argued in the brief on appeal may be deemed by this Court to be waived.").

11. W.Va. Const. Art. 3, Sec. 7 provides in relevant part, that "[n]o law abridging the freedom of speech ... shall be passed[.]"

12. *See Harrison v. Edison Brothers Apparel Stores*, 924 F.2d 530 (4th Cir.1991); *White v. American Airlines*, 915 F.2d 1414 (10th Cir. 1990); *Travis v. Gary Community Mental Health Center*, 921 F.2d 108 (7th Cir.1990); *Eldridge v. Felec Serv.*, 920 F.2d 1434 (9th Cir.1990); *Short v. School Admin. Unit No. 16*, 136 N.H. 76, 612 A.2d 364 (1992); *Hennessey v. Coastal Eagle Point Oil Co.*, 247 N.J.Super. 297, 589 A.2d 170 (1991); *Smith v. Smithway Motor Xpress, Inc.*, 464 N.W.2d 682 (Iowa 1991); *Bennett v. Hardy*, 113 Wash.2d 912, 784 P.2d 1258 (1990); *Greeley v. Miami Valley Maintenance Contractors, Inc.*,

49 Ohio St.3d 228, 551 N.E.2d 981 (1990); *Chavez v. Manville Prod. Corp.*, 108 N.M. 643, 777 P.2d 371 (1989); *Luedtke v. Nabors Alaska Drilling*, 768 P.2d 1123 (Alaska 1989); *Griess v. Consolidated Freightways Corp.*, 776 P.2d 752 (Wyo. 1989); *Sterling Drug, Inc. v. Oxford*, 294 Ark. 239, 743 S.W.2d 380 (1989); *Peru Daily Tribune v. Shuler*, 544 N.E.2d 560 (Ind.Ct.App.1989); *Burk v. K–Mart Corp.*, 770 P.2d 24 (Okla.1989); *Wiltsie v. Baby Grand Corp.*, 105 Nev. 291, 774 P.2d 432 (1989); *Berube v. Fashion Ctr. Ltd.*, 771 P.2d 1033 (Utah 1989); *Cronk v. Intermountain Rural Elec. Ass'n*, 765 P.2d 619 (Colo.Ct.App. 1988); *Palmer v. Brown*, 242 Kan. 893, 752 P.2d 685 (1988); *Mello v. Stop & Shop*, 402 Mass. 555, 524 N.E.2d 105 (1988); *Johnson v. Kreiser's, Inc.*, 433 N.W.2d 225 (S.D.1988); *Phipps v. Clark Oil & Refining Corp.*, 408 N.W.2d 569 (Minn. 1987); *Krein v. Marian Manor Nursing Home*, 415 N.W.2d 793 (N.D.1987); *Ambroz v. Cornhusker Square Ltd.*, 226 Neb. 899, 416 N.W.2d 510 (1987); *Wandry v. Bull's Eye Credit Union*, 129 Wis.2d 37, 384 N.W.2d 325 (1986); *Payne v. Rozendaal*, 147 Vt. 488, 520 A.2d 586 (1986); *Grzyb v. Evans*, 700 S.W.2d 399 (Ky.1985); *Boyle v. Vista Eyewear*, 700 S.W.2d 859 (Mo.Ct.App. 1985); *Bowman v. State Bank*, 229 Va. 534, 331 S.E.2d 797 (1985); *Wagenseller v. Scottsdale Memorial Hospital*, 147 Ariz. 370, 710 P.2d 1025 (1985); *Ludwick v. This Minute of Carolina, Inc.*, 287 S.C. 219, 337 S.E.2d 213 (1985); *Jones v. Memorial Hosp. Sys.*, 677 S.W.2d 221 (Tex.App. 1984); *Clanton v. Cain–Sloan Co.*, 677 S.W.2d 441 (Tenn.1984); *MacDonald v. Eastern Fine Paper, Inc.*, 485 A.2d 228 (Me.1984); *Parnar v. Americana Hotels, Inc.*, 65 Haw. 370, 652 P.2d 625 (1982); *Adler v. American Standard Corp.*,

aptly stated in *Parnar v. Americana Hotels, Inc.*, 65 Haw. 370, 380, 652 P.2d 625, 631 (1982), that:

> In determining whether a clear mandate of public policy is violated, courts should inquire whether the employer's conduct contravenes the letter or purpose of a constitutional, statutory, or regulatory provision or scheme. Prior judicial decisions may also establish the relevant public policy. However, courts should proceed cautiously if called upon to declare public policy absent some prior legislative or judicial expression on the subject.

In *Cordle*, 174 W.Va. at 325, 325 S.E.2d at 114, this Court quoted approvingly the observation made in *Allen v. Commercial Casualty Ins. Co.*, 131 N.J.L. 475, 477–78, 37 A.2d 37, 38–39 (1944), that:

> Much has been written by text writers and by the courts as to the meaning of the phrase "public policy." All are agreed that its meaning is as "variable" as it is "vague," and that there is no absolute rule by which courts may determine what ... contravene[s] the public policy of the state. The rule of law, most generally stated, is that "public policy" is that principle of law which holds that "no person can lawfully do that which has a tendency to be injurious to the public or against public good ..." even though "no actual injury" may have resulted therefrom in a particular case "to the public." It is a question of law which the court must decide in light of the particular circumstances of each case.

We noted in *Yoho v. Triangle PWC, Inc.*, 175 W.Va. 556, 561, 336 S.E.2d 204, 209 (1985), that:

The power to declare an action against public policy is a broad power and one difficult to define. "No fixed rule can be given to determine what is public policy. (citations omitted). It is sometimes defined as that principle of law under which freedom of contract or private dealings are restricted by law for the good of the community—the public good." *Higgins v. McFarland*, 196 Va. 889, 894, 86 S.E.2d 168, 172 (1955). Nevertheless, despite the broad power vested in the courts to determine public policy, we must exercise restraint when we use it[:]

> The right of a court to declare what is or is not in accord with public policy does not extend to specific economic or social problems which are controversial in nature and capable of solution only as the result of a study of various factors and conditions. It is only when a given policy is so obviously for or against the public health, safety, morals or welfare that there is a virtual unanimity of opinion in regard to it, that a court may constitute itself the voice of the community so declaring. *Mamlin v. Genoe*, 340 Pa. 320, 325, 17 A.2d 407, 409 (1941).

In contrast to the issue of public policy, an issue which is fairly debatable or controversial is by nature better left for legislative determination.

**Public Policy And Wrongful Discharge.** In reviewing public policy wrongful discharge cases by this Court, we have found the vast majority of our cases involved public policy that was clearly articulated by statutes[13] or

291 Md. 31, 432 A.2d 464 (1981); *Davis v. Louisiana Computing Corp.*, 394 So.2d 678 (La.Ct. App.1981); *Palmateer v. International Harvester Co.*, 85 Ill.2d 124, 52 Ill.Dec. 13, 421 N.E.2d 876 (1981); *Toussaint v. Blue Cross & Blue Shield*, 408 Mich. 579, 292 N.W.2d 880 (1980); *Sheets v. Teddy's Frosted Foods, Inc.*, 179 Conn. 471, 427 A.2d 385 (1980); *Gay Law Students Ass'n v. Pacific T&T Co.*, 24 Cal.3d 458, 156 Cal.Rptr. 14, 595 P.2d 592 (1979); *Jackson v. Minidoka Irrigation Dist.*, 98 Idaho 330, 563 P.2d 54 (1977); *Nees v. Hocks*, 272 Or. 210, 536 P.2d 512 (1975); *Geary v. United States Steel Corp.*, 456 Pa. 171, 319 A.2d 174 (1974).

**13.** *See Williamson v. Greene*, 200 W.Va. 421, 490 S.E.2d 23 (1997); *Page v. Columbia Natural Resources, Inc.*, 198 W.Va. 378, 480 S.E.2d 817 (1996); *Roberts v. Adkins*, 191 W.Va. 215, 444 S.E.2d 725 (1994); *Reed v. Sears, Roebuck & Co., Inc.*, 188 W.Va. 747, 426 S.E.2d 539 (1992); *Lilly v. Overnight Transp. Co.*, 188 W.Va. 538, 425 S.E.2d 214 (1992); *Slack v. Kanawha County Housing and Redevelopment Authority*, 188 W.Va. 144, 423 S.E.2d 547 (1992); *Mace v. Charleston Area Medical Center Foundation, Inc.*, 188 W.Va. 57, 422 S.E.2d 624 (1992); *Davis v. Kitt Energy Corp.*, 179 W.Va. 37, 365 S.E.2d 82 (1987); *Wiggins v. Eastern Associated Coal Corp.*, 178 W.Va. 63, 357 S.E.2d 745 (1987); *Shanholtz v. Monongahela Power Co.*, 165 W.Va. 305, 270 S.E.2d 178 (1980).

common law. In fact, in a recent decision by this Court, *Tudor v. Charleston Area Medical Center, Inc.*, 203 W.Va. 111, 506 S.E.2d 554 (1997), we recognized public policy emanating from a state regulation on hospital patient care as providing the basis for a constructive discharge claim. In *Cordle* we recognized a public policy claim emanating from the common law right of privacy as a basis for a wrongful discharge involving an employee who refused to take an employer polygraph test. *See also Twigg v. Hercules Corp.*, 185 W.Va. 155, 406 S.E.2d 52 (1990) (where we held it was contrary to public policy emanating from the common law right of privacy for an employer to require an employee to submit to drug testing).

In *McClung v. Marion County Commission*, 178 W.Va. 444, 360 S.E.2d 221 (1987), this Court addressed the question of public policy emanating from the state constitution as a basis for a wrongful discharge action by an at-will government employee. In *McClung* the plaintiff was employed by the county commission as the dog warden for Marion County. During his employment the plaintiff failed to respond to three telephone calls involving animals. As a result of the conduct, the plaintiff was suspended for five days without pay. On the last day of his suspension the plaintiff filed an action against the county commission for its failure to pay him overtime wages. Within a few days after the plaintiff brought his action for overtime wages, the county commission terminated the plaintiff's employment. The plaintiff subsequently amended his complaint to add a claim for retaliatory discharge. A jury trial was held. A verdict was returned in favor of the plaintiff. The trial court set aside the jury verdict and granted judgment notwithstanding the verdict to the county commission. The trial court was of the opinion that the plaintiff was an employee at will and that the evidence did not support his retaliatory discharge claim. On appeal this Court was asked to determine whether public policies emanating from the state constitutional right to petition for redress of grievances under W.Va. Const. Art. III, Sec. 16 and the right to seek access to the courts of this state under W.Va. Const. Art. III, Sec.

17, formed the basis for a wrongful discharge action by an at-will employee terminated for exercising the aforementioned rights by filing an action for overtime wages. This Court responded to the question by holding:

> One of the fundamental rights of an employee is the right not to be the victim of a "retaliatory discharge," that is, a discharge from employment where the employer's motivation for the discharge is in contravention of a substantial public policy.... Certainly it is in contravention of substantial public policies for an employer to discharge an employee in retaliation for the employee's exercising his or her state constitutional rights to petition for redress of grievances (W.Va. Const. Art. III, Sec. 16) and to seek access to the courts of this State (W.Va. Const. Art. III, Sec. 17) by filing an action ... for overtime wages.

*McClung*, 178 W.Va. at 450, 360 S.E.2d at 227. Ultimately, we reversed the trial court in *McClung* and reinstated the jury verdict. In doing so, we observed as a general matter that "[a] public officer or public employee, even one who serves at the will and pleasure of the appointing authority, may not be discharged in retribution for the exercise of a constitutionally protected right, unless a substantial governmental interest outweighs the public officer's or public employee's interest in exercising such right." *Id.* Citing, *Connick v. Myers*, 461 U.S. 138, 142, 103 S.Ct. 1684, 1687, 75 L.Ed.2d 708, 716–17 (1983); Syl. pt. 2, *Woodruff v. Board of Trustees*, 173 W.Va. 604, 319 S.E.2d 372 (1984); Syl. pt. 3, *Orr v. Crowder*, 173 W.Va. 335, 315 S.E.2d 593 (1983), cert. denied, 469 U.S. 981, 105 S.Ct. 384, 83 L.Ed.2d 319 (1984).

In *Woodruff v. Board of Trustees of Cabell Huntington Hosp.*, 173 W.Va. 604, 319 S.E.2d 372 (1984), fourteen former employees of Cabell Huntington Hospital were terminated after distributing leaflets critical of cutbacks by the hospital, as well as other issues. The employees sought a writ of mandamus compelling reinstatement. The employees argued that their terminations were violative of their state and federal constitutional rights to free speech, as well as other constitutional guarantees. We initially observed in *Woodruff* that "[t]he United States

Supreme Court has long held that public employees may not 'be compelled to relinquish the First Amendment rights they would otherwise enjoy as citizens to comment on matters of public interest in connection with the operation of the public [institutions] in which they work.'" *Id.* 173 W.Va. at 609, 319 S.E.2d at 377, quoting, *Pickering v. Board of Education,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811, 817 (1968). Citing, *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980); *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); *Keyishian v. Board of Regents,* 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967). In making the decision to grant the relief sought by the employees this Court stated:

Unquestionably, the distribution of leaflets is an activity protected under constitutional free speech guarantees. In *Lovell v. City of Griffin,* 303 U.S. 444, 452, 58 S.Ct. 666, 669, 82 L.Ed. 949, 954 (1938), Chief Justice Hughes, writing for a unanimous Court, observed, "The liberty of the press is not confined to newspapers and periodicals. It necessarily embraces pamphlets and leaflets. These indeed have been historic weapons in the defense of liberty, as the pamphlets of Thomas Paine and others in our own history attest." Since *Lovell,* the United States Supreme Court has continued its staunch protection of the right of citizens to distribute leaflets and other printed matter.

*Woodruff,* 173 W.Va. at 609, 319 S.E.2d at 377–78, citing, *United States v. Grace,* 461 U.S. 171, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983); *Organization for a Better Austin v. Keefe,* 402 U.S. 415, 91 S.Ct. 1575, 29 L.Ed.2d 1 (1971); *Martin v. City of Struthers,* 319 U.S. 141, 63 S.Ct. 862, 87 L.Ed. 1313 (1943); *Jamison v. Texas,* 318 U.S. 413, 63 S.Ct. 669, 87 L.Ed. 869 (1943); *Schneider v. State,* 308 U.S. 147, 164, 60 S.Ct. 146, 152, 84 L.Ed. 155, 166 (1939).

In *Orr v. Crowder,* 173 W.Va. 335, 315 S.E.2d 593 (1983), the plaintiff filed a complaint alleging, among other things, that she was given a terminal one year contract by the defendants, a public community college and its officials, as a result of her criticism of remodeling plans for the college's facilities. The plaintiff contended that her firing violated her right to free speech under the First Amendment. A trial was held. The jury returned a plaintiff's verdict. The defendants appealed. On appeal, defendants argued that plaintiff failed to prove her criticism of defendants was a substantial or motivating factor in her being given a terminal contract. We observed in *Orr* "that under *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), public employees are entitled to be protected from firings, demotions and other adverse employment consequences resulting from the exercise of their free speech rights, as well as other First Amendment rights." *Orr,* 173 W.Va. at 343, 315 S.E.2d at 601. *Orr* noted that even under *Pickering* the right to free speech is not absolute. In *Orr,* we listed the limitations imposed on the right of free speech:

First, speech, to be protected, must be made with regard to matters of public concern. Second, statements that are made "'with the knowledge [that they] ... were false or with reckless disregard of whether [they were] ... false or not,'" are not protected. Third, statements made about persons with whom there are close personal contacts which would disrupt "discipline ... or harmony among coworkers" or destroy "personal loyalty and confidence" may not be protected.

*Orr,* 173 W.Va. at 343, 315 S.E.2d at 601–602 (internal citations omitted). This Court ultimately affirmed the jury verdict in the case. In doing so we formulated an allocation of the burden of proof on a free speech claim in syllabus point 4:

In a suit under 42 U.S.C. Sec. 1983, where the plaintiff claims that he was discharged for exercising his First Amendment right of free speech, the burden is initially upon the plaintiff to show: (1) that his conduct was constitutionally protected; and (2) that his conduct was a substantial or motivating factor for his discharge. His employer may defeat the claim by showing that the same decision would have been reached even in the absence of the protected conduct.

*See also Gooden v. Board of Appeals of West Virginia Dept. of Public Safety*, 160 W.Va. 318, 234 S.E.2d 893 (1977) (state trooper's discharge for criticizing state police violated First Amendment right of free speech).

None of this Court's prior decisions applied public policy emanating from the state constitution to a wrongful discharge case involving a private sector employee. Ms. Tiernan contends that our decision in *Mace*[14] suggests that public policy emanating from the state constitution may form the basis for a wrongful discharge action by a private sector employee. The decision in *Mace* relied upon public policy emanating from a statute. We did however cite in syllabus point 9 of *Mace* syllabus point 3 of *McClung*:

> In a retaliatory discharge action, where the plaintiff claims that he or she was discharged for exercising his or her constitutional right(s), the burden is initially upon the plaintiff to show that the exercise of his or her constitutional right(s) was a

substantial or a motivating factor for the discharge. The plaintiff need not show that the exercise of the constitutional right(s) was the only precipitating factor for the discharge. The employer may defeat the claim by showing that the employee would have been discharged even in the absence of the protected conduct.

■ We agree with Ms. Tiernan's analysis. *Mace* suggests that a cause of action for wrongful discharge by a private sector employee *may* be based upon public policy emanating from the state constitution. We make clear today that, an at-will or otherwise employed private sector employee may sustain, on proper proof, a cause of action for wrongful discharge based upon a violation of public policy emanating from a specific provision of the state constitution. Determining whether a state constitutional provision may be applied to a private sector employer must be done on a case-by-case basis, i.e., through selective incorporation and application.[15] By

---

**14.** Ms. Tiernan also agues that our decision in *Bowe v. Charleston Area Medical Center, Inc.*, 189 W.Va. 145, 428 S.E.2d 773 (1993) (per curiam), suggests this Court would in an appropriate case allow public policy emanating from the state constitution to form the basis of a wrongful discharge by a private sector employee. Per curiam opinions are not to be cited as authority. *See Lieving v. Hadley*, 188 W.Va. 197, 201 n. 4, 423 S.E.2d 600, 604 n. 4 (1992).

**15.** The approach that we take in determining which of the state constitutional guarantees apply to private sector employers, is analogous to the approach taken by the United States Supreme Court in its determination of the application of specific clauses in the Bill of Rights to states. The doctrine of selective incorporation was developed by the United States Supreme Court in the 1960's, as a tool for absorbing one-by-one individual guarantees of the federal Bill of Rights into the Due Process Clause of the Fourteenth Amendment, in order to hold them applicable to the states. Nelson Lund, *Federalism and Civil Liberties*, 45 U.Kan.L.Rev. 1045, 1070 (1997). *See also Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961); *Ker v. California*, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963); *Malloy v. Hogan*, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964); *Pointer v. Texas*, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965); *Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965); *Klopfer v. North Carolina*, 386 U.S. 213, 87 S.Ct. 988, 18 L.Ed.2d 1 (1967); *Duncan v. Louisiana*, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968); *Benton v. Maryland*, 395 U.S. 784, 89 S.Ct. 2056, 23

L.Ed.2d 707 (1969). The selective incorporation doctrine interprets the Due Process Clause as encompassing only those rights deemed fundamental under an "ordered liberty" standard. The ordered liberty standard includes substantive as well as procedural rights and is not limited to rights established by historical usage at the time of the federal constitution's adoption. The ordered liberty standard may encompass rights that extend beyond the specific Bill of Rights guarantees, as well as rights found within those guarantees. The selective incorporation doctrine focuses on the total guarantee rather than on a particular aspect presented in an individual case. It assesses the fundamental nature of the guarantee as a whole rather than any one principle based on the guarantee. Selective incorporation judges the guarantee as a whole and produces a ruling that encompasses the full scope of the guarantee. Under selective incorporation, when a guarantee is found to be fundamental, due process "incorporates" the guarantee and extends to the states the same standards that apply to the federal government under that guarantee. Thus, under selective incorporation a ruling that a particular guarantee is within the ordered liberty concept carries over to the states the "entire accompanying doctrine" interpreting that guarantee. The selective incorporation doctrine directs a court to test the fundamental nature of a right within the context of that common law system of justice, rather than against some hypothesized system or a foreign system growing out of different traditions. The question to be asked, is whether a right is necessary to an Anglo–American regime of ordered liberty. Con-

so holding, we must now review this case to determine whether Ms. Tiernan can sustain a cause of action for wrongful discharge based upon a violation of public policy because of the exercise of free speech. The specific inquiry in this case is whether or not public policy emanating from the Free Speech Clause of the state constitution applies to speech by private sector employees who criticize or disagree with policies or other lawful actions taken by their private sector employers. To support her claim, Ms. Tiernan turns to federal cases. Ms. Tiernan cites the decision in *Novosel v. Nationwide Insurance Co.*, 721 F.2d 894 (3rd Cir.1983), wherein the Third Circuit held that public policy emanating from the free speech clause of Pennsylvania's constitution was applicable to private sector employers.

In *Novosel* the plaintiff brought a wrongful discharge action in federal court against his former private sector employer. The plaintiff alleged that the sole reason for his discharge was his refusal to participate in the employer's lobbying effort and his privately stated opposition to the employer's position. The United States District Court for the Western District of Pennsylvania, granted the employer's motion to dismiss finding no cause of action. The issue on appeal was whether or not public policy emanating from the free speech clause of Pennsylvania's constitution and the First Amendment was applicable to a private employer. Initially, the Court of Appeals canvassed principles involving infringement on the First Amendment right of free speech and stated:

> An extensive case law has developed concerning the protection of constitutional rights, particularly First Amendment rights, of government employees. As the Supreme Court has commented, "[f]or most of this century, the unchallenged dogma was that a public employee had no right to object to conditions placed upon the terms of employment—including those which restricted the exercise of constitutional rights." *Connick v. Myers*, 461 U.S. 138, [143] 103 S.Ct. 1684, 1688, 75 L.Ed.2d

708 (1983). The Court in *Connick*, however, also observed the constitutional repudiation of this dogma: "[f]or at least 15 years, it has been settled that a state cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression." Id. at 1687, 103 S.Ct. 1684, citing *Branti v. Finkel*, 445 U.S. 507, 515–516, 100 S.Ct. 1287, 1293–1294, 63 L.Ed.2d 574 (1980); *Perry v. Sindermann*, 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972); *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); *Keyishian v. Board of Regents*, 385 U.S. 589, 605–606, 87 S.Ct. 675, 684–685, 17 L.Ed.2d 629 (1967). "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *Board of Education v. Barnette*, 319 U.S. 624, 642, 63 S.Ct. 1178, 1187, 87 L.Ed. 1628 (1943). Thus, there can no longer be any doubt that speech on public issues "has always rested on the highest rung of the hierarchy of First Amendment values." *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, [913] 102 S.Ct. 3409, [3425] 3426, 73 L.Ed.2d 1215 (1982), quoting *Carey v. Brown*, 447 U.S. 455, 467, 100 S.Ct. 2286, 2293, 65 L.Ed.2d 263 (1980).

*Novosel*, 721 F.2d at 899.

After canvassing prior law involving the discharge of public employees for exercising their constitutional rights, *Novosel* concluded:

> Although [the plaintiff] is not a government employee, the public employee cases do not confine themselves to the narrow question of state action. Rather, these cases suggest that an important public policy is in fact implicated wherever the power to hire and fire is utilized to dictate the terms of employee political activities. In dealing with public employees, the cause of action arises directly from the Constitution

---

sistent with this approach, the United States Supreme Court gives considerable weight to the very presence of a right within the Bill of Rights because that presence reflects an important body

of opinion as to the need for such a right in a common law system. Jerold H. Israel, *Selective Incorporation: Revisited*, 71 Geo.L.J. 253, 290–292 (1982).

rather than from common law developments. The protection of important political freedoms, however, goes well beyond the question whether the threat comes from state or private bodies. The inquiry before us is whether the concern for the rights of political expression and association which animated the public employee cases is sufficient to state a public policy under Pennsylvania law. While there are no Pennsylvania cases squarely on this point, we believe that the clear direction of the opinions promulgated by the state's courts suggests that this question be answered in the affirmative.

*Novosel,* 721 F.2d at 900.

The Court of Appeals remanded the case to the district court with instructions that it utilize the following test to determine the sufficiency of plaintiff's claim:

1. Whether, because of the speech, the employer is prevented from efficiently carrying out its responsibilities;

2. Whether the speech impairs the employee's ability to carry out his own responsibilities;

3. Whether the speech interferes with essential and close working relationships;

4. Whether the manner, time and place in which the speech occurs interferes with business operations.

*Novosel,* 721 F.2d at 901.

Ms. Tiernan concedes that *Novosel* is dubious authority today. *Novosel* interpreted, without precedent, the constitution of Pennsylvania as providing public policy applicable to a private sector employer. Since the decision in *Novosel* the Supreme Court of Pennsylvania has disapproved of *Novosel's* interpretation of its constitution. *See Paul v. Lankenau Hospital,* 524 Pa. 90, 569 A.2d 346 (1990).[16] Moreover, the Third Circuit has explicitly retreated from *Novosel's* interpretation of Pennsylvania's constitution. *See Borse v. Piece Goods Shop, Inc.,* 963 F.2d 611 (3rd Cir.1992) (stopping short of overruling *Novosel,* but making clear Pennsylvania Supreme Court would not apply constitutional public policy to a private employer). Additionally, "*Novosel* has been described as the most far-reaching extension of the public policy doctrine and as a dramatic break with precedent because prior cases had unanimously required that government action be present in order for a constitutional violation to exist." Lisa Bingham, *"Employee Free Speech in the Workplace: Using the First Amendment as Public Policy for Wrongful Discharge Actions,"* 55 Ohio St. L.J. 341, 350 n. 39 (1994).

The prevailing view among the majority of courts addressing the issue is that state or federal constitutional free speech cannot, in the absence of state action, be the basis of a public policy exception in wrongful discharge claims.[17] *See Johnson v. Mayo Yarns, Inc.,* 126 N.C.App. 292, 484 S.E.2d 840 (1997);

**16.** In *Martin v. Capital Cities Media, Inc.,* 354 Pa.Super. 199, 223–225, 511 A.2d 830, 842–843 (1986), the plaintiff alleged wrongful discharge by a private employer based upon public policy found in the free speech clause of Pennsylvania's constitution. In rejecting plaintiff's attempt to impose constitutional public policy on the private employer, the Court held:

In the instant case, the employer was a private business entity, not a government agency. The public policy involved was the freedom of commercial speech[.] The legitimate business reason for the discharge is to be found in the employer's right to discharge an employee he perceives to be disloyal.

Our holding instantly does not diminish the right of freedom of speech. But freedom of speech is subject to numerous constraints that render it a less-than absolute right in practice. The rights of others sometimes clash with and restrict one's freedom of speech. Just as one does not have the right to shout "fire" in a crowded theater, so too, the theater owner surely has the right to discharge an usher if he is the one who shouted "fire."

An employer also has the right to discharge an employee for certain speech which is protected by the Constitution. Even when the Constitution allows one to speak freely, it does not forbid an employer from exercising his judgment to discharge an employee whose speech in some way offends him.

**17.** Ms. Tiernan cited in her brief, without discussion, the decision in *Jones v. Memorial Hosp. Sys.,* 677 S.W.2d 221 (Tex.App.1984). Ms. Tiernan suggests that *Jones* permits a private employee to bring a wrongful discharge action against a private employer premised upon the free speech public policy found in the constitution of Texas. *Jones* does not stand for such a proposition. The employee in *Jones* was a nurse who was terminated by her employer, after writing an article which was disapproved by her employer. The employee argued that her termination was an

*Drake v. Cheyenne Newspapers, Inc.*, 891 P.2d 80 (Wyo.1995); *Albertson's, Inc. v. Ortiz*, 856 S.W.2d 836 (Tex.App.1993); *Shovelin v. Central N.M. Elec. Coop. Inc.*, 115 N.M. 293, 850 P.2d 996 (1993); *Prysak v. R.L. Polk Co.*, 193 Mich.App. 1, 483 N.W.2d 629 (1992); *Booth v. McDonnell–Douglas Truck Serv.*, 401 Pa.Super. 234, 585 A.2d 24 (1991); *Korb v. Raytheon Corp.*, 410 Mass. 581, 574 N.E.2d 370 (1991); *Barr v. Kelso–Burnett Co.*, 106 Ill.2d 520, 88 Ill.Dec. 628, 478 N.E.2d 1354 (1985); *Gil v. Metal Service Corp.*, 412 So.2d 706 (La.App. 4 Cir.1982); *Chin v. AT&T*, 96 Misc.2d 1070, 410 N.Y.S.2d 737 (1978). *See also Hudgens v. NLRB*, 424 U.S. 507, 513, 96 S.Ct. 1029, 47 L.Ed.2d 196 (1976) (constitutional provision guaranteeing free speech does not extend to private conduct). It was persuasively said in *Truly v. Madison General Hospital*, 673 F.2d 763, 767 (5th Cir.1982), that "one does not always insure his own retention in employment by wrapping oneself in the first amendment and launching attacks on one's employer from within its folds. At some point, while the employer has no right to control the employee's speech, he does have the right to conclude that the employee's exercise of his constitutional privileges has clearly over-bal-

anced his usefulness and destroyed his value and so to discharge him." (Citation omitted.)

■ Other than the *Novosel* decision, Ms. Tiernan has cited no persuasive authority supporting her argument that public policy emanating from constitutional free speech is applicable to private employers. Further research has failed to uncover any state court that has so applied state constitutional free speech principles to private employers. Likewise, we have discovered no federal court which applies the First Amendment Free Speech Clause to private employers. However, research did reveal that the State of Connecticut has appropriately addressed the inquiry. The issue was answered in the state code of Connecticut. In Conn.Gen.Stat. Ann. § 31–51q (1987), it states:

Any employer, including the state and any instrumentality or political subdivision thereof, who subjects any employee to discipline or discharge on account of the exercise by such employee of rights guaranteed by the first amendment to the United States Constitution or section 3, 4 or 14 of article first of the Constitution of the state, provided such activity does not substantially or materially interfere with the employee's bona fide job performance or the working relationship between the employ-

---

infringement upon her state constitutional right to free speech. The trial court granted summary judgment for the employer finding that the state constitutional right to free speech did not apply to employment per se. The appeals court recognized a cause of action based upon the state constitutional right to free speech. The appeals court relied upon United States Supreme Court precedent involving government employers. The appeals court specifically reversed and remanded the case for further proceedings to determine whether thé employer was a public hospital or purely private hospital. Implicit in the reversal of *Jones* was a determination that if on remand it was proven that the hospital was a private hospital, the employee did not have a free speech cause of action. In fact, the court of appeals subsequently explicitly stated that *Jones* did not extend the public policy emanating from the state constitutional free speech to private employers. In *Albertson's, Inc., v. Ortiz*, 856 S.W.2d 836, 840 (Tex.App.1993), the court of appeals held that *Jones* was not "authority for the proposition that article I, section 8 provides a cause of action for damages against a private entity, when that question was never before the court. We likewise decline to recognize a compensatory cause of action to redress a wholly private enti-

ty's infringement of free-speech rights guaranteed by the state constitution."

Additionally, Ms. Tiernan cited in her reply brief the case of *Carl v. Children's Hospital*, 702 A.2d 159 (D.C.App.1997) (per curiam) (en banc). *Carl* does not stand for the proposition urged by Ms. Tiernan. The employee in *Carl* was a nurse who was fired by the defendant hospital. One of the claims asserted by the employee was that she was wrongfully discharged because of her testimony before the Council of the District of Columbia, on matters conflicting with her employer. The trial court dismissed the case on the grounds that only one public policy exception existed to cover termination of at-will employees. The Court of Appeals found that the trial court committed error in finding that only one public policy could be invoked in a wrongful discharge case by an at-will employee. The majority per curiam opinion remanded the case to determine whether public policy emanating from specific code provisions of the District of Columbia was violated by the termination of the employee, because of her testimony before the Council of the District of Columbia. *Carl* did not address the First Amendment right to free speech and the defendant hospital was a private institution.

ee and the employer, shall be liable to such employee for damages caused by such discipline or discharge, including punitive damages, and for reasonable attorney's fees as part of the costs of any such action for damages. If the court determines that such action for damages was brought without substantial justification, the court may award costs and reasonable attorney's fees to the employer.[18]

The Connecticut statute is the only legislative effort in the nation to extend the full gamut of constitutional principles to private employers. This Court believes that it is necessary for the legislature of this state to determine, and so state that public policy emanating from the state constitutional Free Speech Clause is applicable to private employers. Therefore, we hold, that the Free Speech Clause of the state constitution is not applicable to a private sector employer. In the absence of a statute expressly imposing public policy emanating from the state constitutional Free Speech Clause upon private sector employers, an employee does not have a cause of action against a private sector employer who terminates the employee because of the exercise of the employee's state constitutional right of free speech.[19] Insofar as the circuit court granted summary judgment to CAMC on Ms. Tiernan's Free Speech Clause cause of action, that basis for summary judgment is affirmed.

**18.** For decisions interpreting the statute *see D'Angelo v. McGoldrick,* 239 Conn. 356, 685 A.2d 319 (1996); *Urashka v. Griffin Hospital,* 841 F.Supp. 468 (D.Conn.1994). *See also, Cotto v. United Technologies Corporation, Sikorksy Aircraft Division,* 48 Conn.App. 618, 711 A.2d 1180 (1998) ("An employee's right as a citizen to participate in discussions concerning matters of public importance on or off the work site of the employer cannot be converted into a right guaranteed by the federal or state constitution to express a grievance about the working conditions of employment").

**19.** This holding does not invalidate nor impact upon the state's whistle-blower laws. *See* W.Va. Code § 6C–1–1, et seq. The whistle-blower laws present an independent statutory basis for liability should an employer retaliate against an employee for reporting wrongdoing or waste, as those terms are defined by statute. In this case, Ms. Tiernan does not contend that her statutory

## B.

### *Tortious Interference With Business Relationship*

Ms. Tiernan next argues that CAMC interfered with her employment relationship with ABHC by causing her termination.[20] In its summary judgment order, the circuit court listed alternative reasons for granting CAMC's summary judgment on this theory. The circuit court found: 1) that CAMC had authority to control ABHC and therefore CAMC could not be said to interfere with itself; 2) that CAMC furnished truthful information to ABHC; and 3) that even if CAMC was a stranger to ABHC, the information given to ABHC by CAMC regarding Ms. Tiernan was truthful and therefore an absolute defense. For these reasons the circuit court granted CAMC summary judgment on Ms. Tiernan's theory of tortious interference with a business relationship.

In syllabus point 2 of *Torbett v. Wheeling Dollar Sav. & Trust Co.,* 173 W.Va. 210, 314 S.E.2d 166 (1983), we discussed the necessary requirements to prove a prima facie case of tortious interference in an employment relationship along with the factors that may show the interference was proper:

To establish prima facie proof of tortious interference, a plaintiff must show:

(1) existence of a contractual or business relationship or expectancy;

rights under our whistle-blower laws were violated.

**20.** Ms. Tiernan's employment with ABHC appears to have been that of an at-will employee. The existence of an at-will employment relationship does not insulate a defendant from liability for tortious interferences. *See Toney v. Casey's General Stores, Inc.,* 460 N.W.2d 849, 853 (Iowa 1990); *Europlast, Ltd. v. Oak Switch Systems, Inc.,* 10 F.3d 1266, 1274 (7th Cir.1993). The tort of interference with a business relationship does not require that the relationship be evidenced by an enforceable contract. *See Tamiami Trail Tours, Inc. v. Cotton,* 463 So.2d 1126 (Fla.1985); *Northern Plumbing & Heating, Inc. v. Henderson Bros., Inc.,* 83 Mich.App. 84, 93, 268 N.W.2d 296 (1978). Until an employee is actually terminated, the at-will employment remains valid and subsisting, and third persons may not improperly interfere with it. *See* Restatement (Second) of Torts § 766 cmt. g. (1979).

(2) an intentional act of interference by a party outside that relationship or expectancy;

(3) proof that the interference caused the harm sustained; and

(4) damages.

If a plaintiff makes a prima facie case, a defendant may prove justification or privilege, affirmative defenses. Defendants are not liable for interference that is negligent rather than intentional, or if they show defenses of legitimate competition between plaintiff and themselves, their financial interest in the induced party's business, their responsibility for another's welfare, their intention to influence another's business policies in which they have an interest, their giving of honest, truthful requested advice, or other factors that show the interference was proper.

The difficulty with the circuit court's granting summary judgment on this claim, is that material issues of fact were in dispute with respect to the court's initial reason for granting summary judgment. Those disputed issues of fact were actually resolved by the circuit court. For example, as to the issue of CAMC's control of ABHC, there is clearly disputed evidence explaining the relationship between CAMC and ABHC. There is evidence in the record suggesting that CAMC controlled ABHC.[21] There is also evidenced by officials at ABHC that CAMC had no authority to decide hiring and termination matters for ABHC.[22] The circuit court disregarded these disputed issues and concluded that CAMC and ABHC were synonymous. The circuit court reasoned alternatively that the information provided by CAMC was truthful. Therefore, regardless of the relationship between CAMC and ABHC, Ms. Tiernan's claim failed.

This Court has never addressed the issue of whether truth, in and of itself, bars a claim for tortious interference with a business relationship. Under *Torbett* "honest, truthful *requested* advice" may shield a defendant from liability on a claim for tortious interference with a business relationship. However, the Restatement (Second) of Torts § 772 (1979) states the following regarding the giving of advice:

### Advice as Proper or Improper Interference

One who intentionally causes a third person not to perform a contract or not to enter into a prospective contractual relation with another does not interfere improperly with the other's contractual relation, by giving the third person

(a) *truthful information,* or

(b) honest advice within the scope of a request for the advice.

(Emphasis added.) A majority of the courts which have interpreted and adopted § 722 of the Restatement have held that truth is an absolute bar to a claim for tortious interference with a business relationship.[23] Other courts have rejected the § 722 of the Restatement. *See Pratt v. Prodata, Inc.,* 885 P.2d 786, 790 (Utah 1994) ("we reject defendant's call to adopt truthfulness as an absolute defense to the tort of intentional interference with prospective economic relations"); *Collincini v. Honeywell, Inc.,* 411 Pa.Super. 166, 601 A.2d 292, 295 (1991) (rejecting unrequested truth as a bar to action).

---

**21.** The brief of CAMC contends that:

ABHC operated under a management agreement with CAMC. Clearly, CAMC is not a stranger to the relationship between ABHC and Tiernan.

**22.** A director of nursing at ABHC, Joyce L. Durham, testified at a deposition regarding hiring as follows:

Q. So if I understand it then, you and Mr. Byrd and Ms. Gouhin, as you were making a hiring decision, you viewed yourselves as Arthur B. Hodges as a separate entity not connected in that sense with CAMC.

A. We always had, yes.

Q. And did you always make hiring decisions in that same way, that is, with consideration of what was good for Arthur B. Hodges?

A. Independent of CAMC, yes, we did.

**23.** *See Worldwide Primates, Inc. v. McGreal,* 26 F.3d 1089 (11th Cir.1994); *In re American Continental/Lincoln Sav. & Loan,* 884 F.Supp. 1388 (D.Ariz.1995); *Francis v. Dun & Bradstreet, Inc.,* 3 Cal.App.4th 535, 4 Cal.Rptr.2d 361 (1992); *Prazma v. Kaehne,* 768 P.2d 586 (Wyo.1989); *C.R. Bard v. Wordtronics Corp.,* 235 N.J.Super. 168, 561 A.2d 694 (1989) *Wabash R. Co. v. Young,* 162 Ind. 102, 69 N.E. 1003 (1904).

Courts adopting the Restatement's position have failed to clearly articulate the basis for so doing. Likewise, this Court's decision in *Torbett* provides no real explanation as to why we failed to adopt, in its entirety, § 722 of the Restatement and instead limited "truth" as a defense, to "honest, truthful *requested* advice." We believe *Torbett's* formulation is correct within the confines of that case. The *Torbett* decision focused only on § 722(b). *Torbett* did not address § 772(a).

■ In the instant proceeding there is no evidence showing that the communication by CAMC with ABHC was for the purpose of giving "advice" about Ms. Tiernan.[24] The communication was "truthful information" regarding what CAMC knew about Ms. Tiernan.[25] Therefore, the applicable provision of the Restatement in the instant case is § 772(a), not § 772(b). The comment to § 772(a) states that truthful information is an absolute bar to a claim of tortious interference "whether or not the information is requested." Ms. Tiernan does not dispute that the information given was truthful. Consistent with this Court's reasoning in *Torbett*,

we now adopt § 722 of the Restatement in its entirety. Therefore, the circuit court's alternative grounds for granting summary judgment on the tortious interference claim was correct.[26]

## C.

### *The Remainder of Ms. Tiernan's Assignments of Error*

■ Ms. Tiernan contends that the circuit court committed error by granting CAMC summary judgment on her claims for breach of oral contract, detrimental reliance, and violation of public policy embodied in statutes and regulations regarding political activity and adequate patient care.[27] The orders granting summary judgment on these remaining causes of action do not state the basis for the circuit court's decision on each of them. This Court held in syllabus point 3 of *Fayette County Nat. Bank v. Lilly*, 199 W.Va. 349, 484 S.E.2d 232 (1997), that "[a]lthough our standard of review for summary judgment remains de novo, a circuit court's order granting summary judgment must set out factual findings sufficient to permit

---

24. The affidavit of Michael A. King, Senior Vice President for Health Services at CAMC, states in relevant part:

* * *

16. Sometime later I was informed that Ms. Tiernan was working for a union as an organizer. Around that time I also learned that Ms. Tiernan had been hired as a per diem nurse supervisor at Arthur B. Hodges Center.

17. I asked the Administrator at Arthur B. Hodges whether she knew that Ms. Tiernan was a union organizer. I did not direct or suggest to anyone at Arthur B. Hodges that any employment action be taken against Ms. Tiernan.

25. The affidavit of Sandra Dee Vaughan, Administrator for ABHC, states in relevant part:

* * *

3. In August 1994, it was brought to my attention that Ms. Tiernan was simultaneously working as a union organizer and as a nursing supervisor.

4. I found this situation disturbing. Joyce Durham, the Director of Nursing at ABHC stated she would not schedule Ms. Tiernan to work anymore.

26. The Court understands the seemingly harsh result of adopting in totality § 722 of the Restatement. However, Ms. Tiernan had other alternative causes of action by which she could have

asserted her claim for wrongful termination based upon union activity. Discrimination by an employer based upon a person's union activity is actionable under 29 U.S.C. § 158. *See Performance Friction Corporation v. National Labor Relations Board*, 117 F.3d 763 (4th Cir.1997). *See also*, W.Va.Code § 21–1A–1, et seq.; *United Maintenance & Mfg. Co., Inc. v. United Steelworkers of America*, 157 W.Va. 788, 798, 204 S.E.2d 76, 83 (1974) ("When a dispute is subject to the NLRB jurisdiction, a state is preempted from acting to enforce private or public rights"). The record does not indicate if a cause of action was ever filed against ABHC for its role in terminating Ms. Tiernan. However, it seems quite clear from the facts of this case that a prima facie action existed for violation of the above laws prohibiting discrimination resulting from union activity.

27. In this appeal Ms. Tiernan alleges that public policy emanating from W.Va.Code § 21–1A–3 (1996), protected her from termination. CAMC contends that this statute was not raised below by Ms. Tiernan. In fact, the record demonstrates that Ms. Tiernan failed to raise this statutory argument. Therefore, we decline to address that assignment of error. "This Court will not pass on a nonjurisdictional question which has not been decided by the trial court in the first instance." Syl. Pt. 2, *Sands v. Security Trust Co.*, 143 W.Va. 522, 102 S.E.2d 733 (1958).

meaningful appellate review. Findings of fact, by necessity, include those facts which the circuit court finds relevant, determinative of the issues and undisputed." The circuit court's orders on the remaining issues do not meet the standard articulated in *Lilly*. Therefore, we reverse and remand the remaining issues for the circuit court to enter an order on those issues that comports with the mandate of *Lilly*.[28]

## IV.

## CONCLUSION

In view of the foregoing discussion and analysis this Court (1) affirms that part of the circuit court's orders granting CAMC summary judgment on Ms. Tiernan's constitutional claims [29]; (2) affirms that part of the circuit court's orders granting CAMC summary judgment on Ms. Tiernan's claim for tortious interference with a business relationship; and (3) reverse and remands for entry

---

**28.** The order which disposed of Ms. Tiernan's claim for breach of contract, detrimental reliance and statutory and regulatory public policy read as follows:

JUDGMENT ORDER

This matter came on to be heard this 26th day of August, 1996, upon the appearance of the Plaintiff, BETTY A. TIERNAN, by and through WALT AUVIL, her attorney, and the Defendant, CHARLESTON AREA MEDICAL CENTER, INC., by and through DINA MOHLER and STEPHEN A WEBER, its attorneys.

WHEREUPON, the Court proceeded to hear the arguments of counsel upon the Defendant's Motion for Summary Judgment of the Plaintiff's First Amended Complaint; at which time, the Court did take the matter under advisement to consider further of its ruling upon said Motion.

And the Court having pronounced its ruling by teleconference with ELIZABETH A. PYLES appearing for and on behalf of WALT AUVIL, counsel for Plaintiff and DINA MOHLER, counsel for Defendant, on the 30th day of August, 1996, it is hereby accordingly ORDERED that the Defendant's Motion for Summary Judgment be granted as to all counts in the Plaintiff's Complaint and First Amended Complaint.

To all of which adverse rulings, counsel for the Plaintiff objects and excepts.

**29.** Ms. Tiernan raised and briefed only the issue of her state constitutional right to free speech. The circuit court's ruling on Ms. Tiernan's other constitutional issues, (due process and right of association), is affirmed by this opinion solely on the grounds that Ms. Tiernan waived those issues before this Court by failing to raise and brief those matters. *See* Syl. Pt. 6, *Addair v. Bryant*,

---

of *Lilly* findings for that part of the circuit court's orders granting CAMC summary judgment on Ms. Tiernan's claims for breach of contract, detrimental reliance, and violation of statutory and regulatory public policies.

Affirmed in Part; Reversed in Part; and Remanded.

STARCHER, Justice, dissenting, in part and concurring, in part:

(Filed June 2, 1998)

I.

*Introduction*

Ms. Tiernan, an exemplary employee, was fired and then allegedly "blacklisted" by her employer—all because Ms. Tiernan wrote a letter to a newspaper criticizing her employer, and/or because Ms. Tiernan openly brought a newspaper reporter to an employee meeting.[1]

---

168 W.Va. 306, 284 S.E.2d 374 (1981) ("Assignments of error that are not argued in the briefs on appeal may be deemed by this Court to be waived.").

**1.** The following factual summary, somewhat more detailed than the summary given in the majority opinion, is taken from Ms. Tiernan's Petition for Appeal. Obviously, Ms. Tiernan's summary presents the evidence and allegations in the record in a light favorable to Ms. Tiernan's claims. We are reviewing the circuit court's granting of motions for summary judgment against Ms. Tiernan; in addressing such motions, a court also must look at the proffered evidence in the light most favorable to Ms. Tiernan.

The appellant was by all accounts one of the leading lights of the Medical Intensive Care Unit at Charleston Area Medical Center ("CAMC"). Her performance evaluations were consistently superior. Her supervisor literally raved about the job she did, not just as a registered nurse, but as a problem solver and a leader. Patients (including physicians) stuffed her personnel file with notes thanking her for saving their lives and giving their loved ones excellent care.

The appellant's direct supervisor and her manager and the defendant's administration and personnel departments noted on the appellant's 1990 evaluation that she "follows hospital policies and procedures. That she is a resource person to new staff." She is characterized by the employer in the 1990 evaluation as "knowledgeable, flexible, adaptable, ACLS [Advanced Cardiac Life Support] certified, dependable, [and] seen as a leader and resources person by staff."

Parts III.A. and III.B. of the majority opinion uphold the circuit court's grant of summary judgment against Ms. Tiernan, and promulgate two new legal rules that apply to claims of retaliatory discharge and tortious interference with a business relationship.

Appellant's 1991–1992 evaluation by her direct supervisor, approved by the personnel department, notes: "staff perceive you put forth great effort to assure fairness and consistency of assignments. You work hard to meet special needs as well. You are always calm in a crisis, which keeps others calm. You have a gift for generating a 'team approach & support from your staff'. You take changes mid-shift in stride and adapt appropriately." The appellant was noted to "meet . . . standards . . . in patient care, knowledge and skills, professional ethics sections, *plus* you consistently anticipate your staff's needs. You will cheerfully take patients to lighten a heavy load and *still* provide assistance to others. This is a real strength of yours!" (emphasis in original); "consistently teaches [one-to-one] with a non-threatening approach;" "Possess high standards for the care delivered in the unit as well as your own" and a "calm, organized leader," having "great critical care knowledge base, ability to share it effectively," an "excellent clinician," possessing the "ability to gain acceptance for anything needed from staff" a "strong backup for staff—makes them feel supported and more confident." The appellant was noted to have "good ideas to improve unit functioning. Greets others with a smile. Role model of caring for PTS/Families. Caring and supporting of staff."

During her 1992–1993 performance appraisal, the appellant was noted by her direct supervisor to "meet both patient and staff needs," and to "readily [gain] staff acceptance for needed changes." Appellant was further acknowledged to be a "role model and leader" and to be "willing to be involved to change things for the better." The appellant was specifically noted in this evaluation to be "a + influence on the cohesiveness of night shift." She was said to be "very caring with pts. families—expends whatever energy necessary to see that their needs are met."

Appellant's 1993–1994 evaluation was completed by her direct supervisor in March, 1994. The appellant was said to meet or exceed all standards upon which she was measured in this evaluation. Her direct supervisor said that she "contributes positively to unit/shift morale" and acted as a "strong leader in the unit." Appellant was said to exceed the criteria of "utilizing nursing skills in the delivery of care for a given patient population." The appellant, in this regard, was said to "[act] as unit resource in charge role, as well as resource outside of the unit on 3 East." It should be noted that the appellant was awarded a "miracle of MICU" employee recognition award by defendant.

The defendant's stated basis for termination is that the appellant brought a newspaper reporter to a meeting which hundreds of people attended and which was broadcast on a closed circuit TV station over the whole CAMC system. The appellant had, the defendant admits, *no* prior disciplinary actions of any kind during her many years of employment at CAMC.

The purpose of the meeting, which appellant attended with a reporter from the *Charleston Gazette*, was to let CAMC employees know in advance of the discussions going on between St. Francis Hospital and CAMC regarding some kind of joint venture or other business relationship. The same thing was announced at a press conference later that day.

The appellant's efforts to get her job back by appealing within the CAMC system were fruitless. She exhausted every avenue available to her to retain a job that she loved and at which she was exceptionally good.

After considerable difficulty, appellant obtained fairly steady *per diem* employment with the Arthur B. Hodges Center ("ABH"), a long-term care facility located across the street from CAMC General Division. Upon CAMC becoming aware of appellant's employment with ABH, CAMC advised ABH that the appellant was a "union organizer." Thereafter, ABH no longer employed her.

The appellant contends that, therefore, her efforts to obtain employment of a similar nature to that which she enjoyed at CAMC proved fruitless. The appellant claims that on several occasions there would be initial interest expressed, followed by a statement that the potential employer would have to check with CAMC personnel, after which nothing would be heard. The appellant claims she was effectively frozen out of comparable employment after being terminated by CAMC.

After a stint as a manager at a home health agency in Charleston, the appellant resolved to somehow return to critical care hospital nursing. She eventually obtained a contract to do "traveling nurse" work for a company that supplies nurses on a contract basis to hospitals around the country. She was guaranteed nothing beyond the temporary, short term contracts she was offered. She was required to live away from her home and family for long periods.

The appellant contends that the real reason for her termination from CAMC had nothing to do with bringing a reporter to a meeting, but rather was retaliation by CAMC against the appellant for writing a "letter to the editor," which was published in the *Charleston Gazette*, which was critical of certain CAMC actions, and for voicing her concerns and the concerns of other nurses about CAMC's attempts to eliminate safe staffing.

The majority opinion reflects scholarship, intelligence, and diligence. Importantly, the opinion reaffirms the principle that constitutional provisions are a valid source of public policy in our law of employer-employee relations.

However, on the retaliatory discharge and tortious interference issues, the majority opinion boils down to the following two equations:

1. employee + speech = totally unprotected.

2. employer + speech = totally protected.

I disagree with these results, and with the reasoning that leads to them. I therefore respectfully dissent to parts III.A. and III.B. of the majority opinion.

## II.

### Freedom of Speech

At the beginning of the majority's discussion of Ms. Tiernan's retaliatory discharge claim, the majority correctly states that:

[t]he specific inquiry in this case is whether or not public policy emanating from the Free Speech clause of the state constitution applies to speech by private sector employees *who criticize or disagree with policies or other lawful actions taken by their private sector employers.*

*Tiernan v. CAMC,* 203 W.Va. 135, 145, 506 S.E.2d 578, 588 (1998) (emphasis added).

However, this crisp formulation of the free-speech issue raised in this case seems to have been forgotten by the time the opinion enunciates Syllabus Point 4, which states:

The Free Speech Clause of the state constitution is not applicable to a private sector employer. In the absence of a statute expressly imposing public policy emanating from the state constitutional Free Speech Clause upon private sector employers, an employee does not have a cause of action against a private sector employer who terminates the employee because of the exercise of the employee's state constitutional right of free speech.

Syllabus Point 4, *Tiernan v. CAMC,* 203 W.Va. at 137, 506 S.E.2d at 580 (1998).

Thus, while the "specific inquiry" in the instant case involves private-sector employee speech that criticizes or disagrees with an employer that may be unprotected by public policy, the language of Syllabus Point 4 of the majority opinion sweeps broadly to include *all* private sector employee speech—including speech about matters that are none of the employer's legitimate concern.

I am deeply concerned that the broad scope of Syllabus Point 4 would permit private sector employers to penalize and chill an individual's exercise of fundamental democratic rights.

For example, Syllabus Point 4 would allow a restaurant to fire an excellent chef who has no problems at work, for writing a letter to the newspaper in favor of campaign finance reform—or of better wages for chefs! Or, a taxi company could fire a driver with a 20–year spotless record, because she or he called in to a radio talk show to support a woman's freedom of choice—or to call for stricter abortion laws.

In these hypothetical cases or others like them, applying our established law under *Harless v. First National Bank in Fairmont,* 162 W.Va. 116, 246 S.E.2d 270 (1978) and its progeny—which recognize a cause of action for an employee who suffers a retaliatory discharge in violation of public policy—I might well be prepared to hold that a constitutionally-derived public policy protecting freedom of speech that does not unfairly impinge on an employer's legitimate business concerns is indeed essential to and inherent in a system of ordered liberty.

Therefore, in spite of the apparent weight of authority to the contrary in other jurisdictions, as cited in the majority opinion, I am unpersuaded that in *our* jurisdiction we should totally exclude our constitutional free speech guarantee as a source of public policy (as the majority opinion does) in *our* evolution of the law of employer-employee relations.

I can certainly imagine cases, like the examples given above, where I might conclude that public policy—based on our state's constitutional guarantee of the right of free speech—*will* protect an employee from being discharged in retaliation for exercising that right. Moreover, I am confident that the recognition of such protection for employees' exercise of their free-speech rights is the

trend of our common law, however long this long-term trend may take to arrive at a majority position.[2]

2. A thoughtful review of the law relating to the issue of free-speech protection for private sector employees is found in *Carl v. Children's Hospital,* 702 A.2d 159, 174 (D.C.App.1997) *(per curiam)* *(en banc ).* The majority opinion in the instant case, by focusing solely on the brief *per curiam* portion of the *Carl* opinion, *see* 203 W.Va. at 146, n. 17, 506 S.E.2d at 589, n. 17 (1998), does not do justice to *Carl.* The concurring opinion authored by Associate Judge Schwelb in *Carl,* with which I am in substantial agreement, states in part:

> Ms. Carl contends, in substance, that by discharging her for testifying before the Council and for appearing as an expert witness for plaintiffs in medical malpractice cases, Children's Hospital has retaliated against her for exercising her right to free speech. Such retaliation, according to Ms. Carl, is contrary to the public interest because it chills the exercise of fundamental rights.

> ✻   ✻   ✻

[Judge Schwelb continues in *Carl]*

> We have become a nation of employees. We are *dependent upon others for our means of* livelihood, and most of our people have become completely dependent upon wages. If they lose their jobs they lose every resource, except for the relief supplied by the various forms of social security. Such dependence of the mass of the people upon others for all of their income is something new in the world. *For our generation, the substance of life is in another [person's] hands.*

> F. TANNENBAUM, A PHILOSOPHY OF LABOR 9 (1951) (emphasis in original). Because of this economic dependence on the part of employees, the at-will doctrine effectively "forces the non-union employee to rely on the whim of his employer for [the] preservation of his livelihood." *Blades* [Employment at Will v. Individual Freedom: On Limiting the Abusive Exercise of Employer Power, 67 Colum.L.Rev. 1404], 1405 [(1967)]. This dependence "tends to make him a docile follower of his employer's every wish," *id.,* and may inhibit him from speaking his mind freely if what he would like to say differs from that which the employer would like to hear.

> The "central commitment of the First Amendment ... is that debate on public issues should be uninhibited, robust and wide open." *Bond v. Floyd,* 385 U.S. 116, 136, 87 S.Ct. 339, 349, 17 L.Ed.2d 235 (1966) (citation omitted). "It is the purpose of the First Amendment to preserve an uninhibited market-place of ideas in which truth will ultimately prevail...." *Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 390, 89 S.Ct. 1794, 1806, 23 L.Ed.2d 371 (1969).... If an employee like Ms. Carl places her livelihood in jeopardy by speaking out on an issue of public concern, then the "market-place of ideas" is not uninhibited in any realistic sense. The ultimate victory of the forces of truth, which is supposed to emerge from free and open debate, then becomes a far more iffy prospect.

> For these very reasons, the Supreme Court has recognized that although the First Amendment plays no direct role in cases not involving governmental action, "statutory *or common law* may in some situations extend protection or provide redress against a private corporation or person who seeks to abridge the free expression of others." *Hudgens [v. NLRB],* 424 U.S. [507], 513, 96 S.Ct. [1029], 1033 [47 L.Ed.2d 196] (emphasis added). Indeed, the First Amendment "rests on the assumption that the widest possible dissemination of information from diverse and antagonistic sources *is essential to the welfare of the public." Associated Press v. United States,* 326 U.S. 1, 20, 65 S.Ct. 1416, 1424–25, 89 L.Ed. 2013 (1945) (emphasis added). The public interest is thus disserved by "repression of [freedom of expression] by private interests." *Id.* (footnote omitted).

> These principles are profoundly relevant to at-will doctrine jurisprudence.

> ✻   ✻   ✻

> Ms. Carl's right to express herself freely is not the only interest to be considered in this case. The calculus must also embrace Children's Hospital's perspective. If an employee conducts herself in a manner which significantly impairs her employer's interests, then her claim loses much of its force.

> ✻   ✻   ✻

> If Children's Hospital can demonstrate that this case is analogous to *Korb [v. Raytheon Corp.,* 410 Mass. 581, 574 N.E.2d 370 (1991)], and that this type of exercise of First Amendment rights by a probationary non-management employee could significantly harm the Hospital's financial interest, then this will constitute a formidable defense....

> In relation to any proceedings on remand, the court and jury should be required to

>> balance the interests of the employee, the employer, and the public. Employees have an interest in knowing they will not be discharged for exercising their legal rights. Employers have an interest in knowing they can run their businesses as they see fit as long as their conduct is consistent with public policy. The public has an interest in employment stability and in discouraging frivolous lawsuits by dissatisfied employees.

> *Pierce v. Ortho Pharmaceutical Corp.,* 84 N.J. 58, 417 A.2d 505, 511 (1980). We add the obvious: the public also has an interest in the free expression of ideas on political and other issues.

> *In Novosel [v. Nationwide Ins. Co.,* 721 F.2d 894 (3d Cir.1983)], the Court of Appeals remanded the case to the district court with directions to conduct a four-part inquiry:

>> 1. Whether, because of the speech, the employer is prevented from efficiently carrying out its responsibilities;

The majority opinion's broad new rule in Syllabus Point 4 inexplicably prejudges such cases, and in so doing precludes this Court from engaging in our customary case-by-case development of the common law of retaliatory discharge.

If the majority's approach is too broad, how should we review the circuit court's grant of summary judgment against Ms. Tiernan on her free speech retaliatory discharge claim?

We should formulate a rule that is more narrowly tailored to the actual inquiry that Ms. Tiernan's case presents. Such narrow tailoring would first recognize that the conduct that Ms. Tiernan alleges led to her termination was essentially public criticism of her employer—but was not "whistle blowing," which the majority acknowledges is protected.

A narrowly tailored rule that is appropriately sensitive to the legitimate interests of employers and employees might hold that discipline or termination for speech that is injurious to the employer, workplace or work responsibilities, and is not whistle blowing or otherwise specifically protected by law (human rights, etc.), is ordinarily an unactionable employer prerogative, absent exceptional circumstances.

However, if a private employer fires, disciplines or discriminates against an employee for speech that is not clearly and substantially related to legitimate employer interests, we should recognize that a very different case is presented. In such cases, the public policy promoting free speech and vigorous public discourse on matters of public concern that is embedded in constitutional guarantees [3] *may* protect an employee from retaliatory employer conduct.

Whatever narrower rule we might adopt, we definitely should *not* rule out the possibility, as the majority opinion does, that employees who are terminated for speech that is not substantially related to their employer's legitimate concerns may use the court system to protect and vindicate their right—indeed, their civic duty—to participate fully in our democracy by exercising their right to free speech.

Although a narrower rule might not yield a better result for Ms. Tiernan, such an approach would be fairer to employers and employees in other circumstances, and, therefore, would be a better approach for this Court to take.

I would reverse the circuit court's grant of summary judgment against Ms. Tiernan on her free speech retaliatory discharge claim, and remand the claim for reconsideration by the circuit court under a narrower standard.

### III.

### *Blacklisting*

In Syllabus Point 5, the majority adopts a new rule that gives employers *carte blanche*

---

2. Whether the speech impairs the employee's ability to carry out [her] own responsibilities;

3. Whether the speech interferes with essential and close working relationships;

4. Whether the manner, time and place in which the speech occurs interferes with business operations.

721 F.2d at 901 (citation omitted). I would add to the first of these categories "or from pursuing its business interests."...

In those cases in which an employer has a persuasive business justification for discharging an employee, it is unlikely that he will be held liable for damages under the standard that I suggest. It is possible, of course, that in a close case, the employer will stay his hand, and will keep on an employee who has spoken out, even under circumstances in which the court might sustain a discharge if the controversy were to go to trial. That, however, is not too steep a price to pay for alleviating the harshness of an especially restrictive judge-made doctrine.... Even if the adoption of the exception I propose were to result in the retention, from time to time, of a legally dismissable employee, the world will not end on that account. Indeed, this result might, in the long run, promote the achievement of the free marketplace of ideas which differentiates our democracy from less enlightened forms of governance.

It should not be an inexorable principle of our law that he who pays the piper must always call the tune. The relatively modest departure from the at-will doctrine suggested in this opinion will not render the employer defenseless. It will, however, help to free the law from a judicially imposed albatross which has not served us well.

702 A.2d at 182–186.

3. The facts of the instant case show how freedom of speech and freedom of the press may be interconnected.

the right to maliciously use "the truth" to injure a former employee—even when the employee's situation is none of the employer's concern. The majority's new rule would also apply to the same sort of malicious conduct by one business against another business. I strongly dissent to the adoption of such a rule.

Ms. Tiernan alleges that after she was fired, her first employer (truthfully) told her next employer (and possibly other potential employers) that Ms. Tiernan was a pro-union activist, causing Ms. Tiernan to lose her job and experience difficulty finding other work. A common name for this sort of conduct— by employers or by unions—is "blacklisting." Ms. Tiernan sought recovery for her injuries from this alleged blacklisting conduct by asserting a claim against her first employer for tortious interference with business relations.

Our longstanding rule governing tortious interference is found in *Torbett v. Wheeling Dollar Sav. & Trust Co.*, 173 W.Va. 210, 314 S.E.2d 166 (1983), Syllabus Point 2:

> To establish prima facie proof of tortious interference, a plaintiff must show:
>
> (1) existence of a contractual or business relationship or expectancy;
>
> (2) an intentional act of interference by a party outside that relationship or expectancy;
>
> (3) proof that the interference caused the harm sustained; and
>
> (4) damages.
>
> If a plaintiff makes a prima facie case, a defendant may prove justification or privilege, affirmative defenses. Defendants are not liable for interference that is negligent rather than intentional, or if they show defenses of legitimate competition between plaintiff and themselves, their financial interest in the induced party's business, their responsibility for another's welfare, their intention to influence another's business policies in which they have an interest, their giving of honest, truthful requested advice, or other factors that show the interference was proper.

The majority opinion's Syllabus Point 5 actually modifies *Torbett*, by holding that interference which takes the form of literally truthful statements can *never* be found to be improper:

> In the context of tortious interference with a business relationship, one who intentionally causes a third person not to perform a contract or not to enter into a prospective business relation with another does not interfere improperly with the other's business relation, by giving the third person (a) truthful information, or (b) honest advice within the scope of a request for the advice. Restatement (Second) of Torts § 722 (1979).

Syllabus Point 5, *Tiernan v. CAMC*, 203 W.Va. at 137, 506 S.E.2d at 580 (1998).

With this modification of *Torbett*, this Court has adopted a rule stating that any interference in business relations—no matter how unwarranted, odious, intermeddling, officious, vicious, harmful, devastating or offensive—must in all cases be immunized, simply because the interferer uses literally "truthful information" as his or her weapon of choice in carrying out the interference. Such a rule is far too broad, as the following examples demonstrate.

What if a maliciously anti-union person or entity compiled and circulated a clandestine "blacklist" of known pro-union workers to employers, with the hope and intent of interfering with and injuring these workers in their employment relationships? If the list was accurate and contained only "truthful information," the compiler and circulator of the list (under the protection of Syllabus Point 5 of the majority opinion) would have no liability for tortious interference, even if the circulation of the list accomplished the circulator's intent of causing grievous harm to the workers and their families.

Additionally, the immunity for "truthful information" malicious interference that is created by the majority's new rule also applies to inter-business conduct. What if a restaurant's business competitor were to maliciously hire pickets to parade on the public sidewalk outside the restaurant, and (truthfully) proclaim to potential patrons that the restaurant owner's spouse works in a controversial women's clinic? Or that the restaurant's owner has been treated for a mental illness?

In such cases, under *Torbett*, a jury could decide if the interference was improper. But under the broad language of Syllabus Point 5, such conduct would be absolutely immune from liability no matter how unjustified the conduct or how grievous the harm caused by the interference—simply because the information used for an interfering purpose was literally truthful.

The broad rule of Syllabus Point 5 is not necessary or fair. And in fact, the majority opinion does not suggest that fairness or necessity supports for adoption of the rule. The majority's sole rationale for holding that "truthfulness is an absolute defense to tortious interference" is that this is the position suggested by the *Restatement (Second) of Torts* Sec. 772.[4]

This is not a good enough reason for changing our established rule. The *Restatement* is not "the law." It is a collection of suggestions offered to courts by a group of legal scholars.

This Court has adopted some of the *Restatement* formulations, either in whole or with some modification, almost always after making a reasoned determination that the *Restatement* formulation will hopefully be fairer and more useful than existing formulations of the law. *See, e.g., Foster v. City of Keyser,* 202 W.Va. 1, 501 S.E.2d 165 (1997) (adopting the *Restatement* formulation of *res ipsa loquitur*); *Hendricks v. Stalnaker,* 181 W.Va. 31, 380 S.E.2d 198 (1989) (following *Restatement* approach in nuisance cases); *Harless v. First National Bank in Fairmont,* 162 W.Va. 116, 246 S.E.2d 270 (1978) (adopting *Restatement* formulation of intentional infliction of emotional distress).

In other instances, we have considered but not adopted the *Restatement* formulation. *See, e.g.,* Syllabus Point 7, *Morningstar v. Black and Decker Mfg. Co.,* 162 W.Va. 857, 253 S.E.2d 666, (1979) (declining to adopt the *Restatement* formulation in product liability cases). *See also* note 4, *supra* (noting that

this Court in *Torbett* declined to adopt the *Restatement* tortious interference language.)

In the instant case, the majority opinion does not discuss the purported merits of the *Restatement* 772 formulation. The majority is apparently following the lead of the other courts that the majority opinion acknowledges have adopted 772, while failing "to clearly articulate the basis for so doing." 203 W.Va. at 150, 506 S.E.2d at 593.

The comments to the *Restatement* acknowledge that the law of tortious interference is unsettled. The comments also reflect the fact that a substantial number of courts and jurists have taken the position that truth is not always an absolute defense in tortious interference cases.

For example, the position that the communication of truthful information may in some circumstances be held to be improper interference is taken by courts not only in Utah, *Pratt v. Prodata, Inc.,* 885 P.2d 786 (Utah 1994) and Pennsylvania, *Collincini v. Honeywell, Inc.* 411 Pa.Super. 166, 601 A.2d 292 (Pa.Super.1991) *appeal denied,* 530 Pa. 651, 608 A.2d 27 (1992), *cert. denied,* 506 U.S. 869, 113 S.Ct. 199, 121 L.Ed.2d 141—as cited in the majority opinion—but also in Rhode Island, *C.N.C. Chemical Corp. v. Pennwalt,* 690 F.Supp. 139 (D.R.I.1988); Ohio, *Carman v. Entner,* 1994 WL 28633, No. 13978, Feb. 2, 1994 (Ohio App. 2 Dist.) (unpublished); and Illinois, *Stonestreet Marketing Services, Inc. v. Chicago Custom Engraving, Inc.,* 1994 WL 162824, No. 93–C–1785, April 28, 1994 (U.S.D.C.N.D.Ill.) (unpublished).

The court in *C.N.C., supra,* said that "the general rule that communicating truthful information does not constitute 'improper' interference should not be viewed as absolute." 690 F.Supp. at 143.

The *Stonestreet, supra,* court stated that:

... the truthful nature of the communications simply entitles Defendants to a quali-

---

4. The majority suggests that it is acting "[c]onsistent with our reasoning in *Torbett*." 203 W.Va. at 150, 506 S.E.2d at 593. However, in *Torbett* this Court acknowledged and recited the *Restatement's* general tortious interference formulation, but chose *not* to adopt it, stating: "[w]e have relied upon the Restatement for guidance in outlining elements of and defenses to improper interference *but, of course, are not tied to its categories and definitions." Torbett,* 173 W.Va. at 216, 314 S.E.2d at 172 (emphasis added). Moreover, truthfulness as a defense to tortious interference was not an issue in *Torbett*.

fied or conditional privilege which is a defense unless the jury concludes Defendants abused the privilege or took action motivated by desires other than the interest protected by the privilege.

1994 WL 162824 at *8, note 2.

In *Carman supra,* the court said:

No Ohio case-law exists that produces any bright-line test to determine whether the Entners should avoid liability for tortious interference with a contract where the same statement producing the liability is not actionable under as [sic] slander of title. However, we do not think, as a matter of public policy, that individuals may escape liability on the basis that otherwise clear and unprivileged threats are constructed from statements that are literally true. It has been recognized in Pennsylvania that although truth is an absolute defense in defamation actions, "truth is not a defense to intentional interference with contractual relations." *Collincini v. Honeywell, Inc.* (1991), [411 Pa.Super. 166] 601 A.2d 292, 296, *appeal denied,* [530 Pa. 651] 608 A.2d 27, *certiorari denied,* [506 U.S. 869] 113 S.Ct. 199 [121 L.Ed.2d 141].

\* \* \*

We find that the existence of a privilege to interfere with a contract depends essentially on whether the interfering party has a need to interfere with the contract. The rule is that where there is no need to interfere with a contract to protect a genuine legal right, even truthful statements, calculated to interfere with the contract, are actionable. The exception is where the interfering party has a bona fide belief that the contract will impair or destroy his genuine legal rights.

Under the above rule and exception, the connection between truth and privilege is a question of fact. And the burden of proving the defense of a privilege to interfere clearly rests with the defendant.

Proving the truth of all express statements made to parties to the contract may not always be sufficient to show that the defendant was privileged to interfere with the contract.

1994 WL 28633 at *7 (citations and footnote omitted).

The court in *Pratt, supra* stated:

[W]e reject defendants' call to adopt truthfulness as an absolute defense to the tort of intentional interference with prospective economic relations.

885 P.2d at 790.

Additionally, the dissenting opinion in *Four Nines Gold, Inc., v. 71 Const., Inc.,* 809 P.2d 236 (Wyo.1991), by Chief Justice Urbigkit, states in part:

"The privilege [of truth] is conditional and if the occasion were used not to give *bona fide* advice, but to injure the plaintiff for any ulterior reason, the defendant should lose his privilege and therefore fail in his defense."

\* \* \*

Truthfulness when said to be some kind of excuse for harmful action cannot be extracted from propriety and justification.

*Id.* at 249–250 (citations omitted).

The foregoing cases and language provide persuasive authority and reasoning in support of the position that "truthful information" should not be an absolute defense to tortious interference. Additionally, the following language from *Florida Star v. B.J.F.,* 491 U.S. 524, 532, 109 S.Ct. 2603, 2608–09, 105 L.Ed.2d 443, 454–55 (1989) is pertinent to the issue of the wisdom of approving of truthfulness as an absolute defense. The Supreme Court said in *Florida Star:*

Nor need we accept appellant's invitation to hold broadly that truthful publication may never be punished consistent with the First Amendment. Our cases have carefully eschewed reaching this ultimate question, mindful that *the future may bring scenarios which prudence counsels our not resolving anticipatorily.*

*Id.* (emphasis added).

What rule would be better than Syllabus Point 5 of the majority opinion? A simple, reasonable, middle-ground and fair approach would hold that the truthfulness of an interfering statement is a legitimate "factor" under Syllabus Point 2 of *Torbett* to be considered along with all other circumstances in

evaluating the propriety of any interference. Syllabus Point 2 of *Torbett* states, in part:

> Defendants are not liable for interference that is negligent rather than intentional, or if they show defenses of legitimate competition between plaintiff and themselves, their financial interest in the induced party's business, their responsibility for another's welfare, their intention to influence another's business policies in which they have an interest, their giving of honest, truthful requested advice, *or other factors that show the interference was proper.*

(Emphasis added.)

This approach would allow a tribunal to give consideration to the concerns that underlie the *Restatement* 772 formulation—and would avoid the *Restatement*'s grant of blanket immunity in all cases where a party's maliciously interfering statement is literally true.

Under such a rule, a jury could consider the truthfulness of Ms. Tiernan's former employer's interfering statements, along with all of the other circumstances of the interference, in determining whether the former employer's conduct was or was not improper interference with Ms. Tiernan's business relations.[5] This would be fair.

For the foregoing reasons, I strongly dissent to the majority's new Syllabus Point 5, and to the affirmance of the circuit court's grant of summary judgment against Ms. Tiernan on her tortious interference claim. I would reverse and remand for Ms. Tiernan's claim to be considered under *Torbett*, with an appropriately narrow rule that allows truthfulness to be considered as one of the relevant factors in deciding whether her employer's interference with Ms. Tiernan's business relationships was improper.

### IV.

#### *Conclusion*

I would reverse the circuit court's grant of summary judgments on the appellant's claim for free speech retaliatory discharge and her claim for interference with a business relationship. I concur in the majority's reversal of summary judgment of the appellant's other causes of action.

McCUSKEY, Justice, concurring:
(Filed June 29, 1998)

In its zeal to have this Court, rather than the Legislature, draft and adopt two new causes of action for litigants in West Virginia, the dissent stands the West Virginia Constitution on its ear. I fully concur with the result reached by the Chief Justice's well-reasoned opinion. I write separately to aid the public's understanding of these complex, but vital, issues, and also to highlight the public danger that would have arisen had the minority position prevailed.

It is important to reiterate clearly what this case is, and is not, about: The plaintiff, Betty Tiernan, was a salaried, management employee of CAMC when she was terminated on May 2, 1994, for violating her employer's rules by bringing a newspaper reporter into a private meeting of CAMC management and staff. Although she claimed otherwise, the circuit court judge found no evidence that the plaintiff was terminated for any spoken words or speech, or for any activity related to union organizing. Plainly stated, she was fired for refusing to follow the work rules related to the security of her employer.

After her termination, Ms. Tiernan worked for several months as a union organizer and then took a part-time job as a nursing supervisor with a private nursing home. CAMC informed this employer of the fact that the plaintiff had been recently employed as a union organizer, after which the nursing home ceased employing her. After the second termination, the plaintiff sued CAMC for both terminations, alleging that CAMC (1) violated her Constitutional rights of free speech by terminating her and (2) wrongfully caused the nursing home to terminate her by relating to it the truthful information about her work as a union organizer. The plaintiff and her attorney chose **not** to cast her law-

---

5. We discussed the respective roles of judges and juries, in evaluating allegedly improper conduct in employer—employee relations, in *Travis v.*

*Alcon Laboratories,* 202 W.Va. 369, 378, note 7, 504 S.E.2d 419, 428, note 7 (1998).

suit, or seek a remedy, against CAMC for possible violations of the unfair labor practices provision of the National Labor Relations Act (such as blacklisting) or against the nursing home for wrongful termination.[1]

Thus, the issues facing this Court were whether the Circuit Court of Kanawha County was correct in dismissing Ms. Tiernan's Constitutional Free Speech claim and also dismissing her claim for damages against CAMC for the results of relating truthful information to her subsequent employer.

The dissent's arguments on the second point are most seriously flawed, and, therefore, I address that area of the law first. In recent years, potential tort liability arising from providing employment information and recommendations to a prospective employer has been the subject of considerable attention and debate. With a growing and mobile population, employers can no longer rely on the traditional "community reputation" of a person for making hiring decisions, but must, instead, by necessity, increasingly rely on employment references and job recommendations. Concomitant with this reliance has been an increasing number of civil actions by employees against those who give employment information.[2]

These common law actions, usually styled as *tortious interference with contract* claims, have caused several states to enact legislation defining the parameters of such suits; courts in other states have adopted the Restatement (Second) of Torts, section 722 (1979). Although West Virginia has not enacted such legislation, two bills were introduced in the West Virginia House of Delegates in the 1997 Session.[3] Thus, in the absence of legislation, the task has properly

fallen upon this Court to interpret the common law and decide whether to adopt the standards of the Restatement. In choosing to adopt the relevant provision of the Restatement, the majority opinion brings common sense and uniformity to employment law by concluding that a person can not be successfully sued for giving "truthful information" about a former or prospective employee. This is quite analogous to the time honored corollary to Constitutional provisions regarding libel and slander in which "truth" is an absolute defense to a claim, regardless of the motive or intent of the writer or speaker.

Rather than depriving a wronged plaintiff of a remedy, as the dissent would have the public believe, the majority opinion merely refuses to create a new cause of action in West Virginia. By this decision, our Court has clarified a previously ambiguous area of employment law and, most importantly, we have acted to **protect,** not stifle, the right of free speech by allowing a person to give truthful employment information without the risk of legal reprisal.

A trip by the dissent down the ladder from the ivory tower to the realities of the world at ground level might be an eye opening experience as to why courts in other states have rejected the minority's reasoning. If previous employers, and those who have knowledge about job applicants, are muzzled by the fear and threat of lawsuits, the result will, as Chief Justice John Marshall once said, "come(s) home in its effects in every man's fireside."

It is a realistic expectation that, under the minority position, every facet of our lives would be endangered: workers whose lives

---

1. The dissent's claim that the majority opinion limits a citizen's rights to bring either of these types of actions is simply not true. "Blacklisting" is clearly an unlawful act under federal labor law. *See* Labor Management Relations Act, 29 USCA § 158(a)(1); *see also, Phelps Dodge Corp. v. N.L.R.B.,* 313 U.S. 177, 61 S.Ct. 845, 85 L.Ed. 1271 (1941), and its progeny. Blacklisting has been tacitly recognized as a common law tort in West Virginia. Retaliatory discharge has also long been actionable at common law in West Virginia. *See Harless v. First National Bank of Fairmont,* 169 W.Va. 673, 289 S.E.2d 692 (1982), for both propositions.

2. *See* 50 ALR Fed 722, *Adverse Employment References as Unlawful under Title VII of Civil Rights Act of 1964,* for a review of cases supporting the proposition that an employee's dissemination of adverse references is unlawful where a discriminatory intent is shown.

3. House Bill 2165, introduced on February 20, 1997, related to employer immunity for disclosure of information regarding former law enforcement officers; House Bill 2733, introduced March 25, 1997, related to immunity of all employers for employment information.

depend on the level of safety in workplaces would be placed at risk by newly hired co-workers whose background and safety record could no longer be checked; children in day care, the sick, the aged and infirm would not be protected from caretakers who have a history of molesting or preying upon these defenseless groups; small business owners, whose entire livelihood is invested, sometimes for generations, could be financially ruined, and their employees left jobless, by the actions of one employee whose background could not be effectively questioned or verified. Indeed, every citizen who depends upon police officers, firefighters, or emergency personnel has a stake in the pursuit of truth in the hiring and employment process.

As indicated earlier, the issue of Constitutional Free Speech did not have to be addressed by the majority, since speech of the plaintiff was not truly involved. I would have disposed of that issue by simply affirming the circuit court's dismissal of the plaintiff's free speech claim on the grounds that her right of free speech was not in question. Ironically, it was CAMC's right of free speech that actually was at issue; it was sued for stating the truth about the plaintiff.

Nonetheless, the reasoning of the majority opinion is right and firmly grounded in State and Federal Constitutional jurisprudence. West Virginia's Bill of Rights, Article III, Section 7, has been part of our State Constitution since its introduction at West Virginia's first Constitutional Convention in 1861 at Wheeling. Entitled "Right of Speech and Press Guaranteed," it reads the same today as it did 137 years ago. Clearly and unambiguously, the framers of our Constitution, borrowing from the United States Constitution, acted to protect our citizens from *governmental interference* with their free speech by saying: **No law abridging the freedom of speech, or of the press, shall be passed.**

There is no mention through the three volumes of verbatim transcripts constituting the *Debates and Proceedings of the First Constitutional Convention of West Virginia, 1861–1863,* that our framers intended, as the plaintiff urges, to provide a cause of action by which private parties can sue each other for the results of their mutual exercise of free speech. Quite obviously, the above quoted Constitutional provision, and its federal counterpart, were intended to protect citizens from governmental, not private, infringement on their rights of free speech. If the government were to intercede, like a verbal referee, in the free speech debate between private citizens, it would, in reality, be infringing on the rights of free speech of one party over the other. I, for one, do not like the thought or the likely results. If my neighbor insults me, I believe I should retain my right to tell him to leave my property without fear of reprisal by lawsuit.

Perhaps President Harry Truman demonstrated the clearest understanding of the practical nature of American life when he responded to the charge that he was prone to verbal abuse of his enemies. He replied, "I have never deliberately given anybody hell. I just tell the truth and they think it's hell."

The cherished right of Free Speech in America is best protected if it is not expanded beyond our right to speak freely without governmental interference.

WORKMAN, Justice, dissenting, in part, and concurring, in part:

(Filed July 21, 1998)

While I concur with some of the principles set forth in the majority opinion, I vehemently dissent from the majority's holding that the Free Speech Clause of the state constitution is not applicable to private sector employers. This all-encompassing holding is wrong from a legal perspective and wrong from a policy perspective. I do not believe it is the law of the United States and I will not subscribe to it being the law of West Virginia.

Furthermore, I disagree with the majority's conclusion that truthful communications are always a defense to tortious interference with a business relationship, even if such communications are malicious and intended to do harm. Both of these issues should have been governed by a much more cautious analysis of the law in the context of this action and the two new points of law should have been far more narrowly drawn.

## I. FREE SPEECH

The specific issue before this Court which gave rise to the free speech question was whether "public policy emanating from the Free Speech Clause of the state constitution applies to speech by private sector employees who criticize or disagree with policies or other lawful actions taken by their private sector employers." The majority, however, abandons this concrete and limited question to cut across the constitution with a sharp and wide swath. In moving their analysis from a very concrete to an all-encompassing framework, they elevate statutes over our state constitution, they misinterpret the law from other jurisdictions, give no deference to precedent, and, as the authorities cited below indicate, they depart from a lengthy body of jurisprudential law holding that West Virginia's constitution is in many respects even more protective of our citizens' rights than the United States Constitution.

First, an examination of the case law upon which the majority relies reflects a gross misapprehension on the part of the majority as to what theses cases say:

The cases cited by the majority expressly connect the absence of a cause of action for the employee's exercise of free speech to speech that has a legitimate "employment-related nexus." *Grzyb v. Evans,* 700 S.W.2d 399 (Ky.1985). In *Johnson v. Mayo Yarns,* 126 N.C.App. 292, 484 S.E.2d 840 (1997), a case upon which the majority cites as supportive of its holding, the court determined that an employee's refusal to obey his private employer's directive to remove a Confederate flag decal from his workplace toolbox was not constitutionally protected speech or expression and therefore, no public policy violation occurred which would permit an actionable wrongful discharge claim. *Id.,* 484 S.E.2d at 843. Accepting the employer's contention that "the right of free speech and expression does not extend to the workplace where a private employer must have flexibility in adopting and enforcing its employment policies and practices[,]" the court in *Johnson* ruled that "the plaintiff's conduct *carried out in private employment* is not constitutionally protected activity." *Id.* (emphasis supplied). Similarly, in another decision cited by the

majority, *Drake v. Cheyenne Newspapers, Inc.,* 891 P.2d 80 (Wyo.1995), the court affirmed the dismissal of two employees' retaliatory discharge claim where the management-level employees were fired for refusing to wear buttons urging a "no" vote on union recognition. The court's ruling that "[t]erminating an at-will employee for exercising his right to free speech by refusing to follow a legal directive of an employer *on the employer's premises during working hours* does not violate public policy" was expressly predicated on the generally-applicable maxim that the right to free speech does not extend to private property. *Id.* at 82 (citing *Lloyd Corp., Ltd. v. Tanner,* 407 U.S. 551, 567–70, 92 S.Ct. 2219, 33 L.Ed.2d 131 (1972) and emphasis supplied).

In certain instances, this right of private employers to draw limits on their employees' freedom of speech may even extend beyond the physical premises of the place of employment. For example, in *Korb v. Raytheon Corp.,* 410 Mass. 581, 574 N.E.2d 370 (1991), the court determined that no public policy violation occurred where the discharged employee was the corporate spokesperson. Because the employee spoke out against the interests of his defense contractor employer during a press conference of a nonprofit organization of which he was a board member, the employer legitimately determined that the employee "had lost his effectiveness as its spokesperson." *Id.,* at 372. The court expressly contrasted the situation present in Korb where the employer clearly "had a financial stake in not advocating th[e] position" stated by the employee to one in which "an employee is fired for speaking out on issues in which his employer has no interest, financial or otherwise." *Id.; see also Prysak v. R.L. Polk Co.,* 193 Mich.App. 1, 483 N.W.2d 629, 634 (1992) (finding no free speech violation where computer operator fired for writing a letter which threatened one of his employer's customers and noting distinction between speech that involves matters of public concern versus purely private speech).

In other words, while there is law across the United States that private employers, not being state actors, are not required to *protect*

First Amendment rights of employees, and that they may even be allowed to restrict such rights if there is a nexus between the speech and a valid business-related interest of the employer, the law does not support the conclusion that the First Amendment has no application whatsoever to private employers.

Each of the above-discussed cases was cited by the majority to support its sweeping pronouncement that the Free Speech clause of the state constitution is not applicable to private employers, but none of them supports the extent to which the majority abrogates individual constitutional rights. This holding should have been narrowly drawn to pertain only to that speech which can be determined to have a legitimate "employment-related nexus" either through the location at which the speech is made, i.e. the place of employment, or through the ability of the speech to have a determinable effect on the employer or on the employee's job responsibilities. Absent this limitation, we are clearly authorizing the abrogation of the freedom of speech rights of all private sector employees. I both fear and predict that the majority's holding may be used as a shield to protect private sector employers from wrongful discharge suits that are prompted when an employer discharges an employee when it disagrees with an employee's exercise of his right to freedom of speech even though such speech has nothing whatsoever to do with the employment.

Under the majority holding, for example, an employee could be fired for writing a letter to the editor, joining an organization, wearing a badge, or even speaking out on a public issue, even though such activities are done on his own time and have nothing to do with his employment. I am unable to find any body of law in modern American jurisprudence that permits such an Orwellian result. West Virginia, which has historically been immensely protective of individual rights, stands alone in such an all-encompassing holding.

In the syllabus point of *Harless v. First National Bank in Fairmont*, 162 W.Va. 116, 246 S.E.2d 270 (1978), this Court held:

The rule than an employer has an absolute right to discharge an at will employee must be tempered by the principle that where the employer's motivation for the discharge is to contravene some substantial public policy principle, then the employer may be liable to the employee for damages occasioned by this discharge.

*See also, Tudor v. Charleston Area Medical Center, Inc.*, 203 W.Va. 111, 506 S.E.2d 554 (1997); syl. pt. 1, *McClung v. Marion County Comm.*, 178 W.Va. 444, 360 S.E.2d 221 (1987).

In that regard, this Court has made clear that the Constitution of West Virginia is a source of public policy in the area of employment law. As this Court observed in syllabus point two of *Birthisel v. Tri–Cities Health Services Corp.*, 188 W.Va. 371, 424 S.E.2d 606 (1992): "To identify the sources of public policy for purposes of determining whether a retaliatory discharge has occurred, we look to established precepts in our constitution, legislative enactments, legislatively approved regulations, and judicial opinions." *See also*, syl. pt. 6, *Williamson v. Greene*, 200 W.Va. 421, 490 S.E.2d 23 (1997).

Thus, the suggestion in syllabus point four of the majority opinion that a statute would be required to impose or recognize public policy emanating from the Constitution of West Virginia with regard to free speech is slightly absurd. Certainly, the Constitution of West Virginia is already the law of the land in this State and enjoys a priority over statutory law. In fact, as this Court recognized in syllabus point two of *Pauley v. Kelly*, 162 W.Va. 672, 255 S.E.2d 859 (1979): "The provisions of the Constitution of the State of West Virginia may, in certain instances, require higher standards of protection than afforded by the Federal Constitution." *See also*, Syl. pt. 1, *State v. Bonham*, 173 W.Va. 416, 317 S.E.2d 501 (1984). In *Cordle v. General Hugh Mercer Corp.*, 174 W.Va. 321, 325 S.E.2d 111 (1984), as the majority acknowledges, this Court indicated that public policy is a question of law which a court must decide in light of the particular circumstances of each case. 174 W.Va. at 325, 325 S.E.2d at 114. While the principle thus expressed in *Cordle* may provide certain parameters in considering free speech in the private sector, public policy, as discernable in

the Constitution of West Virginia, need not be selectively incorporated into West Virginia law by statute.

Furthermore, we held in *Tudor v. CAMC*, 203 W.Va. 111, 506 S.E.2d 554 (1997) that a constructive discharge claim may be grounded upon public policy emanating from a mere state regulation. In *Tudor*, the evidence of the plaintiff indicated that her discharge from employment was brought about, in part, because she had voiced concerns about the nurse-patient ratio. Thus, inasmuch as the claim in *Tudor* was upheld by this Court upon the basis of public policy emanating from a regulation, it seems ludicrous to say that public policy cannot emanate from the Constitution of West Virginia.

Lastly, I am disappointed in the concurring opinion. It is full of bombast, but I see not one citation of authority within its body. It parades the horribles, claiming that the reasoning of Justice Starcher's dissent would result in all manner of mayhem, including threats of fire and pestilence. But I see no law cited, nor any meaningful discourse of the legal issues presented. I'd rather "stand the constitution on its ear," as the concurring opinion claims Justice Starcher does, than to throw it out the window.

West Virginia is a state of employees. Under the majority opinion, many could very well be called upon to decide—your freedom of speech or your job! After *Tiernan v. CAMC*, our state slogan "Mountaineers are always free" certainly needs modification.

## II. TORTIOUS INTERFERENCE

Similarly, with regard to the issue of tortious interference with a business relationship, I am of the opinion that the syllabus point should have been more narrowly drawn and that a case-by-case analysis is warranted. Pursuant to the adoption of the Restatement in syllabus point five, truth would be an absolute bar to a claim of tortious interference with a business relationship. Dealing in absolutes, however, is a dangerous game, especially in the world of business and human relations that has evolved since the Restatement was drafted.

Thus, a more practical approach was developed by this Court in *Torbett v. Wheeling Dollar Savings & Trust Co.*, 173 W.Va. 210, 314 S.E.2d 166 (1983), syllabus point two of which states in part:

> If a plaintiff makes a prima facie case [of tortious interference], a defendant may prove justification or privilege, affirmative defenses. Defendants are not liable for interference that is negligent rather than intentional, or if they show defenses of legitimate competition between plaintiff and themselves, their financial interest in the induced party's business, their responsibility for another's welfare, their intention to influence another's business policies in which they have an interest, their giving of honest, truthful requested advice, or other factors that show the interference was proper.

To borrow a phrase from this Court's decision in *Dzinglski v. Weirton Steel Corp.*, 191 W.Va. 278, 445 S.E.2d 219 (1994), however, "a bad motive will defeat a qualified privilege defense." *See also*, 41 Harv.L.Rev. 728 at p. 749–50 (1928), stating that "[t]he privilege is conditional and if the occasion were used not to give *bona fide* advice, but to injure the plaintiff for any ulterior reason, the defendant should lose his privilege and therefore fail in his defense." The above language of *Torbett*, indicating that truth is only a factor to be considered in a tortious interference claim, allows for unforeseen circumstances where a bad motive on the part of the defendant may be dispositive. *See also, Voorhees v. Guyan Machinery Company*, 191 W.Va. 450, 446 S.E.2d 672 (1994), citing *Torbett* and affirming a judgment for the plaintiff for tortious interference, where the former employer, who notified the plaintiff's new employer of the plaintiff's covenant not to compete, failed to show "legitimate competition" between it and the plaintiff's new employer.

Thus, the holding of the majority not only departs from existing law, but may under some circumstances license malicious conduct. When one tortiously interferes with another's employment, even if the truth is employed in such endeavor, such conduct should under some limited circumstances be

actionable if there is malicious intent to do substantial economic harm.